1  EMILY THENARD (SBN 264619)
   SAFEER HOPTON (SBN 271027)
2  SAG-AFTRA
   5757 Wilshire Boulevard, 7th Floor
3  Los Angeles, California 90036-3600
   Telephone: (323) 549-6628
4  Facsimile: (323) 549-6624
   Emily.Thenard@sagaftra.org
5
   Attorney for Petitioner
6  Screen Actors Guild - American Federation
   of Television and Radio Artists
7

COPY

CLERK, U.S. DISTRICT COURT

JUN - 6 2014

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

8          **UNITED STATES DISTRICT COURT**

9          **CENTRAL DISTRICT OF CALIFORNIA**

10
11  SCREEN ACTORS GUILD-          Case No. **CV 14 - 4400E**
    AMERICAN FEDERATION OF
    TELEVISION AND RADIO
12  ARTISTS, a non-profit corporation, as    **NOTICE OF MOTION AND**
    successor-in-interest to SCREEN          **MOTION FOR ORDER**
13  ACTORS GUILD, INC., on behalf of         **CONFIRMING ARBITRATION**
    Affected Performers,                     **AWARD AND FOR ENTRY OF**
14                                           **JUDGMENT IN CONFORMITY**
                                             **THEREWITH; MEMORANDUM OF**
                   Petitioner,               **POINTS AND AUTHORITIES; AND**
15                                           **DECLARATION OF EMILY**
    v.                                       **THENARD IN SUPPORT THEREOF**
16
    ED RENOUARD dba ED           Date:  7-18-14
17  RENOUARD PRODUCTIONS,        Time:  9:30 Am
                                 Place: 20
18              Respondent.      Judge: E
19

20              **NOTICE OF MOTION AND MOTION**

21  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

22       PLEASE TAKE NOTICE that on _____ 7- 18-14 _____,

23  2014, at 9:30 (a.m./p.m., or as soon as this matter may be heard, petitioner

24  Screen Actors Guild-American Federation of Television and Radio Artists ("SAG-

25  AFTRA" or "Union"), as successor-in-interest to Screen Actors Guild, Inc., will

26  move, and hereby does move, the United States District Court, located in

27  Courtroom 20 at 312 N Spring ____, Los Angeles, California,

28  for an Order that:

1.    Confirms the arbitration award in favor of Union and against respondent Ed Renouard dba Ed Renouard Productions ("Respondent"), Union Case No. TM 4569, dated June 25, 2010 ("Arbitration Award"), in all respects;

2.    Enters judgment in conformity therewith;

3.    Awards Union attorney's fees and costs;

4.    Awards such other and further relief as the Court deems just and proper.

This motion is made pursuant to a collective bargaining agreement by which Union obtained the Arbitration Award against Respondent and which expressly provides that the Arbitration Award may be confirmed by the present Court.

This Court's jurisdiction arises under section 301(a) of the Labor Management Relations Act of 1947 (29 USC § 185(a)), as amended, which grants the District Court original jurisdiction over actions relating to violations of collective bargaining agreements between an employer and a labor organization in an industry affecting interstate commerce, without regard to the amount in controversy or the citizenship of the parties.

Venue is proper in the Central District of California because the Arbitration Award was issued in this district.

This motion is based upon this Notice of Motion and Motion as well as the attached Memorandum of Points and Authorities, Declaration of Emily Thenard, all pleadings and papers on file, and upon such further oral or documentary evidence that may be presented at the time of hearing.

Pursuant to Local Rule 7-3, the Union attempted to contact Respondent by telephone on three separate occasions. A phone call to the first number on file was unanswered and a voice message was left to contact the Union regarding this Motion. A subsequent phone call to the same number placed on May 9, 2014 was also unanswered and another voice message was left. A phone call to a second

1　phone number was answered by a receptionist who informed the Union that Ed

2　Renouard was no longer affiliated with that phone number and no forwarding

3　phone number was left. Subsequently, Union sent Respondent a meet and confer

4　letter on May 12, 2014, to Respondent's address of record. As of the date of this

5　filing, Union has not received a response from Respondent.

6

7　Dated: June 5, 2014　　　　　　　　　　　　Respectfully Submitted,

8　　　　　　　　　　　　　　　　　　　　　　SCREEN ACTORS GUILD-
　　　　　　　　　　　　　　　　　　　　　　AMERICAN FEDERATION OF
9　　　　　　　　　　　　　　　　　　　　　　TELEVISION AND RADIO ARTISTS

10

11　　　　　　　　　　　　　　　　　　By:＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
　　　　　　　　　　　　　　　　　　　　Emily Thenard
12　　　　　　　　　　　　　　　　　　　Attorney for Petitioner

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

## MEMORANDUM OF POINTS AND AUTHORITIES

3    Petitioner Screen Actors Guild-American Federation of Television and Radio

4    Artists ("SAG-AFTRA" or "Union"), as successor-in-interest to Screen Actors

5    Guild, Inc. ("SAG"), respectfully submits the following Points and Authorities in

6    support of its motion to confirm an arbitration award and enter a corresponding

7    judgment.

8

9                         I.    STATEMENT OF FACTS

10   A.    The Parties and Underlying Dispute

11   Union is the successor-in-interest to SAG and is a union that represents

12   nearly 165,000 media artists who work in motion pictures, television, radio, the

13   internet, and other media formats. (Declaration of Emily Thenard ("Thenard

14   Dec."), ¶ 3.) Respondent Ed Renouard dba Ed Renouard Productions ("Ed

15   Renouard dba Ed Renouard Productions" or "Respondent" or "Producer") executed

16   a Screen Actors Guild Adherence Letter dated October 16, 2006 agreeing to be

17   bound by the Screen Actors Guild 2003 Commercials Contract and the 2006-2008

18   Extension to the Commercials Contract ("SAG TAL") (Thenard Dec., ¶ 4, Exhibit

19   A.) Producer also executed an AFTRA/SAG Letter of Adherence dated August 29,

20   2005 agreeing to be bound by the 2004-2006 Northwest Regional Code of Fair

21   Practices and the Screen Actors Guild 2003 Commercials Contract ("AFTRA

22   TAL.") (Thenard Dec., ¶ 4, Exhibit B.)

23   During the term of the SAG 2003 Commercials Contract, the 2006-2008

24   Extension to the SAG Commercials Contract and the AFTRA 2004-2006

25   Northwest Regional Code of Fair Practices, Producer produced a Tracy Jewelers

26   Commercial entitled "Lady In Red" ("Commercial"). (Thenard Dec., ¶ 5.) True

27   and correct copies of the executed signature pages and a complete copy of the SAG

28   TAL and the AFTRA TAL are attached to Declaration of Emily Thenard as

1   Exhibits A and B, respectively.[1]

2       Among other things, the SAG TAL and the AFTRA TAL bind Respondent

3   to the terms and conditions of a collective bargaining agreement: the SAG

4   Commercials Contract, as amended ("Commercials Contract"). (Thenard Dec., ¶

5   6.) True and correct copies of the relevant portions of the Commercials Contract

6   are attached to the Declaration of Emily Thenard as Exhibit C.[2]

7       Pursuant to the terms of the SAG TAL, the AFTRA TAL, and the

8   Commercials Contract, Respondent produced the Commercial using Union actors

9   or other performers covered by said agreements (collectively "Performers").

10   (Thenard Dec., ¶ 7.)

11       The Commercial was exhibited for a second season in 2008 which pursuant

12   to section 40 of the Commercials Contract requires that the Performers be paid a

13   holding fee. (Thenard Dec., ¶ 8, Exhibit C.)

14       Pursuant to Sections 32 and 33 of the Commercials Contract, Performers are

15   also due use fees. (Thenard Dec., ¶ 9, Exhibit C.)

16       Additionally, pension and health contributions ("P & H") became due and

17   payable on behalf of Performers pursuant to section 46 of the Commercials

18   Contract. (Thenard Dec., ¶ 10, Exhibit C.)

19       Respondent failed or refused to pay the holding and use fees due to

20   Performers, therefore late payment liquidated damages ("LPLDs") also became due

21   pursuant to section 45 of the Commercials Contract. (Thenard Dec., ¶ 11, Exhibit

22   C.)

23   ///

24   ///

25   ///

26

27   [1] All referenced exhibits throughout the memorandum of points and authorities are expressly incorporated herein as if set forth in full.

28   [2] Because the Commercials Contract is 210 pages in length, only relevant portions of the document have been attached.

B.    Union Obtains Stipulated Arbitration Award Against Producer

On or about August 13, 2009, pursuant to the arbitration provision (section 57A) of the Commercials Contract, Union served a statement of claim and demand for arbitration ("Demand") on Respondent for failure to pay the holding fee and use fee, pension and health contributions, and LPLDs due. (Thenard Dec., ¶ 12, Exhibit D.)

Said statements of claim and demands for arbitration were served in accordance with the notice provision (section 57A) of the Commercials Contract. (Thenard Dec., ¶ 13.)

Respondent refused to pay the amounts due, therefore the Union sent Respondent notice to initiate the arbitrator selection process. (Thenard Dec., ¶ 14, Exhibit E.) Respondent failed to engage in arbitrator selection, therefore, the Union unilaterally selected arbitrator Sara Adler to preside over the arbitration pursuant to Section 57 of the Commercials Contract.   (Thenard Dec., ¶ 15, Exhibit F.)

An arbitration hearing was held on March 15, 2010.  Respondent neither sought a continuance nor appeared at the hearing.  Consequently, Arbitrator Sara Adler issued an arbitration award ("Arbitration Award") on June 25, 2010, in favor of Union and against Producer. (Thenard Dec., ¶ 16.)  A true and correct copy of the Arbitration Award is attached to Thenard Dec. as Exhibit G.  The Arbitration Award provides the following relief:

"Producer is ordered to pay to SAG on behalf of performers in the Picture: Damages for failure to pay holding and use fees and P&H [Pension and Health] Contributions as well as LPLD [Late Pay Liquidated Damages] as follows:

| | | |
|---|---|---|
| Holding fees | $1,184.40 | |
| Use fee | $ 592.20 | |
| P&H | as calculated by SAG | |

1            LPLD           $5,440.00

2           And all costs of collecting and distributing these required payments."

3    (Thenard Dec., ¶ 16.)

4           Pension and Health Contributions are calculated at 14.80% of all gross

5    compensation paid to principal performers. (Thenard Dec., ¶ 17.) The Pension and

6    Health Contributions owed for this claim total $262.94 (14.80% of

7    $1,184.40+$592.20). (Thenard Dec., ¶ 17.)

8           Despite Union's demand, Respondent has failed and continues to fail to pay

9    Union the total amount of **$7,479.54** required by the Arbitration Award, and to

10    otherwise comply with the Arbitration Award. (Thenard Dec., ¶18.)

11

12    C.    Union Presently Seeks Confirmation of the Arbitration Award, Entry of

13          Judgment, and Attorney's Fees and Costs

14           Union hereby seeks an order from this Court confirming the Arbitration

15    Award, with late payment liquidated damages accruing until the date of

16    confirmation. Union also requests that judgment be entered in conformity with the

17    Arbitration Award and include an additional award of attorney's fees and costs.

18    Pursuant to Local Rule 7-3, on May 8, 2014, Petitioner Union attempted to contact

19    Respondent by telephone at its last two known phone numbers regarding the

20    current motion. (Thenard Dec., at ¶ 19.) The phone call to the first number was

21    unanswered and a voice message was left to contact the Union regarding this

22    Motion. (Thenard Dec., at ¶ 19.) A subsequent phone call to the same number

23    placed on May 9, 2014 was also unanswered and another voice message was left.

24    (Thenard Dec., at ¶ 19.) A phone call to a second phone number was answered by

25    a receptionist who informed the Union that Ed Renouard was no longer affiliated

26    with that phone number and no forwarding phone number was left. (Thenard Dec.,

27    at ¶ 19.) Subsequently, Union sent Respondent a meet and confer letter on May

28    12, 2014, at Respondent's addresses of record. (Thenard Dec., at ¶ 19.) As of the

1  date of this filing, Union has not received a response from Respondent. (Thenard

2  Dec., at ¶ 19.) A true and correct copy of the meet and confer letter is attached to

3  Thenard Dec. as Exhibit H. (Thenard Dec., at ¶ 19.)

4

5  ## I.   LAW AND ARGUMENT

6  A.   This Court Is Empowered To Confirm the Arbitration Award.

7  The District Courts are empowered to enforce arbitration awards issued in

8  accordance with a collective bargaining agreement. *United Steelworkers of*

9  *America v. Enterprise Wheel and Car Corp.*, 363 U.S. 597, 80 S.Ct. 1358, 4 L.Ed.

10  2d 1424 (1960). The Arbitration Award in favor of Union and against Respondent

11  was awarded pursuant to a collective bargaining agreement, the Commercials

12  Contract. (Thenard Dec., Exh. F.) Section 57(B) of the Commercials Contract

13  provides that this Award may be confirmed in federal court. (Thenard Dec., Exh.

14  C.) Accordingly, this Court is empowered to confirm and enforce the Award.

15

16  B.   An Arbitration Award Must Be Confirmed If It Draws Its Essence From the
17  Collective Bargaining Agreement.

18  Under the *United Steelworkers* trilogy of cases, the Court will not review the

19  substantive merit of an arbitration award made in accordance with a collective

20  bargaining agreement. See *United Steelworkers v. American Manufacturing Co.*,

21  363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v.*

22  *Warrior and Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d. 1409

23  (1960); *United Steelworkers v. Enterprise Wheel and Car Co.*, supra. Instead, the

24  Court will defer to the arbitrator's legal and factual determinations. *American*

25  *Postal Workers' Union AFL-CIO v. United States Postal Service*, 682 F.2d 1280,

26  1284 (9th Cir. 1982), *cert. denied*, 459 U.S. 1200, 103 S.Ct. 1183, 75 L.Ed.2d 431

27  (1983).

28  C.   The Present Arbitration Award Should Be Confirmed Because the Arbitrator

1    Found That Producer Breached Its Obligations To Union.

2        In the current case, the Arbitrator applied to the facts the relevant provisions

3    of the Commercials Contract, the SAG TAL and the AFTRA TAL, and found that

4    Respondent breached its obligations under said agreements, and awarded monetary

5    and other relief in favor of Union and against Respondent. A true and correct copy

6    of the Arbitration Award is attached to Thenard Dec. as Exhibit F. As a matter of

7    public policy and in the interest of the stability of labor relations, as well as in

8    accordance with Congress' intent as interpreted by the U.S. Supreme Court, the

9    Commercials Contract and the Arbitration Award must be enforced. Accordingly,

10   the Arbitration Award should be confirmed and judgment entered in conformity

11   therewith. *United Steelworkers of America v. Enterprise Wheel and Car Corp.*, at

12   564.

13   D.    Petitioner Union Should Be Awarded Its Attorney's Fees and Costs.

14       Attorney's fees may be recovered in an action brought under Section 301 of

15   the LMRA (29 U.S.C. §185) where a party without justification refuses to abide by

16   the arbitration award. *International Union of Petroleum and Industrial Workers v.*

17   *Western Industrial Maintenance, Inc.*, 707 F.2d 425, 428 (9th Cir. 1983); see also

18   *UAW v. United Farm Tools, Inc.*, 762 F.2d 76, 77 (8th Cir. 1985) (unjustified

19   refusal to abide by arbitration award, combined with failure to act to set aside

20   award, is evidence of bad faith sufficient to warrant attorney's fees).

21       Respondent has not asserted or demonstrated any legal justification for

22   failing to comply with the Arbitration Award. Instead, Respondent has forced the

23   Union to initiate this action in Federal Court to confirm and enforce the Arbitration

24   Award. Considering the prevailing rate for attorney's fees, as well as the estimated

25   8 hours that Union's attorney worked or will have worked in preparing the present

26   motion and supporting documents as well as court appearance time, Union

27   respectfully requests that this Court award attorney's fees in the amount of

28   $2,400.00 and costs in the amount of $400.00 as set forth in the accompanying

1  declaration.  (Thenard Dec., ¶¶ 20-27.)

2

3                            III.    CONCLUSION

4        For the foregoing reasons, petitioner Screen Actors Guild-American

5  Federation of Television and Radio Artists requests that the Court confirm the

6  Arbitration Award, enter judgment in conformity therewith, and award attorney's

7  fees to SAG-AFTRA in the amount of $2,400.00 and costs in the amount of

8  $400.00.

9

10  Dated: June 5, 2014                    Respectfully Submitted,

11                                          SCREEN ACTORS GUILD-
                                            AMERICAN FEDERATION OF
12                                          TELEVISION AND RADIO ARTISTS

13

14                              By:  _Emily Thenard_____
                                         Emily Thenard
15                                       Attorney for Petitioner

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## DECLARATION OF EMILY THENARD

2

I, EMILY THENARD declare as follows:

3    1.    I am an attorney licensed to practice law in the State of California and
4 admitted to this Court. I am the attorney of record for petitioner Screen Actors
5 Guild-American Federation of Television and Radio Artists ("SAG-AFTRA" or
6 "Union"), as successor-in-interest to Screen Actors Guild, Inc. ("SAG"), in this
7 matter.

8    2.    This Declaration is submitted in support of Union's motion for order
9 confirming arbitration award and for entry of judgment in conformity therewith. I
10 prepared the foregoing motion. The allegations contained in the motion are true to
11 the best of my knowledge, except those that are stated on information and belief.
12 As to those matters, I believe them to be true.

13    3.    SAG-AFTRA is the successor-in-interest to SAG and is a union that
14 represents nearly 165,000 media artists who work in motion pictures, television,
15 radio, the internet, and other media formats.

16    4.    Respondent Ed Renouard dba Ed Renouard Productions ("Ed
17 Renouard dba Ed Renouard Productions" or "Respondent" or "Producer") executed
18 a Screen Actors Guild Adherence Letter dated October 16, 2006 agreeing to be
19 bound by the Screen Actors Guild 2003 Commercials Contract and the 2006-2008
20 Extension to the Commercials Contract ("SAG TAL"). Producer also executed an
21 AFTRA/SAG Letter of Adherence dated August 29, 2005 agreeing to be bound by
22 the 2004-2006 Northwest Regional Code of Fair Practices and the Screen Actors
23 Guild 2003 Commercials Contract ("AFTRA TAL"). True and correct copies of
24 the executed signature pages and a complete copy of the SAG TAL and the
25 AFTRA-SAG TAL are attached hereto as Exhibits A and B, respectively.

26    5.    During the term of the SAG 2003 Commercials Contract, the 2006-
27 2008 Extension to the SAG Commercials Contract and the AFTRA 2004-2006
28 Northwest Regional Code of Fair Practices, Producer produced a Tracy Jewelers

1  Commercial entitled "Lady In Red" ("Commercial").

2      6.    Among other things, the SAG TAL and the AFTRA TAL bind
3  Respondent to the terms and conditions of a collective bargaining agreement: the
4  SAG Commercials Contract, as amended ("Commercials Contract").  True and
5  correct copies of the relevant portions of the Commercials Contract are attached
6  hereto as Exhibit C. [1]

7      7.    Pursuant to the terms of the SAG TAL, the AFTRA TAL, and the
8  Commercials Contract, Respondent produced the Commercial using Union actors
9  or other performers covered by said agreements (collectively "Performers").

10     8.    The Commercial has been exhibited for a second season in 2008 which
11  pursuant to section 40 of the Commercials Contract requires that the Performers be
12  paid a holding fee.

13     9.    Pursuant to Sections 32 and 33 of the Commercials Contract,
14  Performer is also due use fees.

15     10.   Additionally, pension and health contributions ("P & H") became due
16  and payable on behalf of Performers pursuant to section 46 of the Commercials
17  Contract.

18     11.   Respondent failed or refused to pay the holding and use fees due to
19  Performers, therefore late payment liquidated damages ("LPLDs") also became due
20  pursuant to section 45 of the Commercials Contract.

21     12.   On or about August 13, 2009, pursuant to the arbitration provision
22  (section 57A) of the Commercials Contract, Union served a statement of claim and
23  demand for arbitration ("Demand") on Respondent for failure to pay the holding
24  fee and use fee, pension and health contributions, and LPLDs due.  A true and
25  correct copy of the statement of claim and demand for arbitration is attached hereto
26  as Exhibit D.

27

28  [1] Because the Commercials Contract is 210 pages in length, only relevant portions of the document have been
attached.

13.     Said statements of claim and demands for arbitration were served in accordance with the notice provision (section 57A) of the Commercials Contract.

14.     Respondent refused to pay the amounts due, therefore the Union sent Respondent notice to initiate the arbitrator selection process.   A true and correct copy of the notice is attached hereto as Exhibit E.

15.     Respondent failed to engage in arbitrator selection, therefore, the Union unilaterally selected arbitrator Sara Adler to preside over the arbitration pursuant to Section 57 of the Commercials Contract.   A true and correct copy of the letter is attached hereto as Exhibit F.

16.     An arbitration hearing was held on March 15, 2010.   Respondent neither sought a continuance nor appeared at the hearing.   Consequently, Arbitrator Sara Adler issued an arbitration award ("Arbitration Award") on June 25, 2010, in favor of Union and against Ed Renouard dba Ed Renouard Productions.   A true and correct copy of the Arbitration Award is attached hereto as Exhibit G.

"Producer is ordered to pay to SAG on behalf of performers in the Picture: Damages for failure to pay holding and use fees and P&H [Pension and Health] Contributions as well as LPLD [Late Pay Liquidated Damages] as follows:

| | | |
|---|---|---|
| Holding fees | $1,184.40 | |
| Use fee | $ 592.20 | |
| P&H | as calculated by SAG | |
| LPLD | $5,440.00 | |

And all costs of collecting and distributing these required payments."

17.     The Pension and Health Contributions are calculated at 14.30% of all gross compensation paid to principal performers.   The Pension and Health Contributions owed for this claim total $262.94 (14.80% of $1,184.40+$592.20).

18.     Despite Union's demand, Respondent has failed and continues to fail

1  to pay Union the total amount of **$7,479.54** required by the Arbitration Award, and
2  to otherwise comply with the Arbitration Award.

3      19.     Pursuant to Local Rule 7-3, on May 8, 2014, Petitioner Union
4  attempted to contact Respondent by telephone at its last two known phone numbers
5  regarding the current motion. The phone call to the first number was unanswered
6  and a voice message was left to contact the Union regarding this Motion. A
7  subsequent phone call to the same number placed on May 9, 2014 was also
8  unanswered and another voice message was left. A phone call to a second phone
9  number was answered by a receptionist who informed the Union that Ed Renouard
10  was no longer affiliated with that phone number and no forwarding phone number
11  was left. Subsequently, Union sent Respondent meet and confer letters on May12,
12  2014, at Respondent's addresses of record. As of the date of this filing, Union has
13  not received a response from Respondent. A true and correct copy of the meet and
14  confer letter is attached to Thenard Dec. as Exhibit H.

15      20.     In addition to confirmation of the Arbitration Award and entry of
16  judgment in conformity therewith, Union seeks attorney's fees and costs.

17      21.     I have practiced law since 2009 in California, where I was admitted to
18  the Bar in November, 2009. I am also admitted to practice in the U.S. District
19  Court for the Central District of California.

20      22.     I have practiced in-house with Union since February, 2013. In that
21  capacity, I represent Union and its members in a wide variety of arbitrations and
22  litigation arising under Union's collective bargaining agreements.

23      23.     I have reviewed my activities on behalf of Union in this matter. In
24  calculating the hours set forth herein, I have considered my time in preparing the
25  present declaration, and related notice of motion and motion, memorandum of
26  points and authorities, proposed judgment, notice of interested parties, as well as
27  correspondence and attempted communications with Respondent and my estimated
28  travel and court time.

24.     I have calculated the reasonable market value of my services by taking the prevailing hourly rate of private attorneys whose practices focus on labor relations law in the entertainment industry and assessing my rate within the lower to mid-range of that scale.  Based upon those rates, a reasonable rate for an attorney of my background and experience is $300.00 per hour.

25.     Fees awarded in this action will not inure to me personally, but will be paid to Union, a non-profit corporation and certified labor organization.

26.     The compensation for which Union is entitled for my services is $2,400.00, which was computed as follows: 8 hours at $300.00 per hour.

27.     The costs incurred in this action total $400.00 in filing costs.

I declare under penalty of perjury that the foregoing is true and correct. Executed at Los Angeles, California, June 5, 2014.


Emily Thenard

"EXHIBIT A"



DATE: 10/16/06

00786171
Magner, Sanborn and Renouard
Ed. Renouard Productions
TO SCREEN ACTORS GUILD:

Dear Ms. or Sir:

We acknowledge that we have previously received of a copy of the Screen Actors Guild 2003 Commercials Contract (hereafter, "2003 Commercials Contract")[610] and that we have received a copy with this letter of the 2006-2008 Screen Actors Guild Extension Memorandum of Agreement (hereafter, "Extension Agreement") (collectively, "Commercials Contracts") and that we are familiar with the terms of both documents. We understand and agree that the 2003 Commercials Contract will apply until and including October 29, 2006, at which time it will expire, and that beginning on October 30, 2006, the Extension Agreement will apply, until it expires on October 29, 2008. We further understand that at the present time the Extension Agreement has not been ratified and we agree that if the ratification vote fails, the Extension Agreement will immediately become null and void, and will cease to bind either the Screen Actors Guild or our company. In that event, the 2003 Commercials Contract will continue to apply until it has been terminated with a sixty-day notice as required by the terms of the 2003 Commercials Contract itself.

We join in the desire to promote stability in the Industry and to maintain harmonious relations with the Screen Actors Guild and its members. To that end, we hereby become a party to and agree to abide by and conform to all of the terms and conditions of the aforementioned Commercials Contracts on our own behalf and on behalf of advertisers for whom commercials are produced by or through our agency. We also specifically agree to abide by Section 57 of the 2003 Commercials Contract, which will continue to apply under the Extension Agreement, and requires that all disputes and controversies of every kind and nature whatsoever arising out of or in connection with the Commercials Contracts be resolved by binding arbitration, except as otherwise provided by the Commercials Contracts themselves.

Without limiting the generality of the foregoing, we agree expressly for the benefit of Screen Actors Guild and all persons covered by the terms of the aforementioned Commercials Contracts that we will make the payments of holding fees and use fees for commercials as provided in the aforementioned Commercials Contracts, and that we will make all Social Security, withholding, unemployment insurance and disability insurance payments required by law with respect to said payments. It is further agreed that we will make all appropriate contributions to the Screen Actors Guild-Producers Pension and Health Plans required under the aforementioned Commercials Contracts with respect to such payments. It is expressly understood and agreed that our right to telecast such commercials shall be subject to and conditioned upon prompt payment by us of such use fees and other payments, and the Screen Actors Guild shall be entitled to injunctive relief in the event such payments are not made.

Screen Actors Guild reserves the right to reject or revoke the signatory status of any company if it determines that such company is not a *bona fide* producer of commercials covered by the Commercials Contracts.

We are enclosing two (2) copies of this Letter of Adherence. Kindly complete and sign one copy and return immediately to: **Screen Actors Guild, Commercials & Industrial Contracts, 5757 Wilshire Boulevard, Los Angeles, CA 90036**

[610] In the event that you no longer possess a copy of the 2003 Commercials Contract, please contact your local SAG office and we will provide one to you.

IN WITNESS HEREOF, the parties have each executed this Contract.

*Accepted and Agreed:*

Ed. Renouard Prockictions

(Company Name)

*By: _____*

(Signature)

Ed Renouard, owner

(Print Signer's Name and Title)

702 E. Mission Ave

(Street Address)

Spokane, WA

(City)                (State)

99202

(Zip Code)

**Please check correct box below**

☑ *Production Company*

☐ *Advertising Agency*

☐ *Advertiser*

☐ *Music Producer*

☐ *Other_____*

**SCREEN ACTORS GUILD**

By: Sandy Kincaid

(Signature)

national Director

(Title)

\*Please refer to next page for information as to who may sign these documents.



DATE: *10.16.06*

00786171
~~Mugner, Sanborn and Renouard~~
Ed. Renouard Productions

TO SCREEN ACTORS GUILD:

Dear Ms. or Sir:

We acknowledge that we have previously received of a copy of the Screen Actors Guild 2003 Commercials Contract (hereafter, "2003 Commercials Contract")[610] and that we have received a copy with this letter of the 2006-2008 Screen Actors Guild Extension Memorandum of Agreement (hereafter, "Extension Agreement") (collectively, "Commercials Contracts") and that we are familiar with the terms of both documents. We understand and agree that the 2003 Commercials Contract will apply until and including October 29, 2006, at which time it will expire, and that beginning on October 30, 2006, the Extension Agreement will apply, until it expires on October 29, 2008. We further understand that at the present time the Extension Agreement has not been ratified and we agree that if the ratification vote fails, the Extension Agreement will immediately become null and void, and will cease to bind either the Screen Actors Guild or our company. In that event, the 2003 Commercials Contract will continue to apply until it has been terminated with a sixty-day notice as required by the terms of the 2003 Commercials Contract itself.

We join in the desire to promote stability in the Industry and to maintain harmonious relations with the Screen Actors Guild and its members. To that end, we hereby become a party to and agree to abide by and conform to all of the terms and conditions of the aforementioned Commercials Contracts on our own behalf and on behalf of advertisers for whom commercials are produced by or through our agency. We also specifically agree to abide by Section 57 of the 2003 Commercials Contract, which will continue to apply under the Extension Agreement, and requires that all disputes and controversies of every kind and nature whatsoever arising out of or in connection with the Commercials Contracts be resolved by binding arbitration, except as otherwise provided by the Commercials Contracts themselves.

Without limiting the generality of the foregoing, we agree expressly for the benefit of Screen Actors Guild and all persons covered by the terms of the aforementioned Commercials Contracts that we will make the payments of holding fees and use fees for commercials as provided in the aforementioned Commercials Contracts, and that we will make all Social Security, withholding, unemployment insurance and disability insurance payments required by law with respect to said payments. It is further agreed that we will make all appropriate contributions to the Screen Actors Guild-Producers Pension and Health Plans required under the aforementioned Commercials Contracts with respect to such payments. It is expressly understood and agreed that our right to telecast such commercials shall be subject to and conditioned upon prompt payment by us of such use fees and other payments, and the Screen Actors Guild shall be entitled to injunctive relief in the event such payments are not made.

Screen Actors Guild reserves the right to reject or revoke the signatory status of any company if it determines that such company is not a *bona fide* producer of commercials covered by the Commercials Contracts.

We are enclosing two (2) copies of this Letter of Adherence. Kindly complete and sign one copy and return immediately to: **Screen Actors Guild, Commercials & Industrial Contracts, 5757 Wilshire Boulevard, Los Angeles, CA 90036**

[610] In the event that you no longer possess a copy of the 2003 Commercials Contract, please contact your local SAG office and we will provide one to you.

**IN WITNESS HEREOF, the parties have each executed this Contract.**

*Accepted and Agreed:*

Ed. Renouard Productions
(Company Name)

*By: _____
(Signature)

Ed. Renouard, owner
(Print Signer's Name and Title)

702 E. Mission Ave.
(Street Address)

Spokane, WA
(City)          (State)

99202
(Zip Code)

**Please check correct box below**

☒ *Production Company*
☐ *Advertising Agency*
☐ *Advertiser*
☐ *Music Producer*
☐ *Other*_____

**SCREEN ACTORS GUILD**

By: Sandy Kincaid
(Signature)

National Director
(Title)

*Please refer to next page for information as to who may sign these documents.

**"EXHIBIT B"**

# AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS / SCREEN ACTORS GUILD

LETTER OF ADHERENCE to the *2004-2006 Northwest Regional Code Of Fair Practice* and to the 2003 Screen Actors Guild Television Commercials Contract Memorandum of Agreement, the 2003 AFTRA Television Recorded Commercials Memorandum of Agreement, and the 2003 AFTRA Radio Recorded Commercials Memorandum of Agreement

The undersigned wishes to enjoy peaceful and pleasant relations with the American Federation of Television and Radio Artists (AFTRA) and the Screen Actors Guild (SAG) and their members and, to that end, the undersigned agrees as follows:

By signing this Letter of Adherence, the undersigned agrees to be bound to the *2004-2006 Northwest Regional Code Of Fair Practice*, (hereinafter referred to as the "Regional Code"), and to the 2003 Screen Actors Guild Television Commercials Contract Memorandum of Agreement, the 2003 AFTRA Television Recorded Commercials Memorandum of Agreement, and the 2003 AFTRA Radio Recorded Commercials Memorandum of Agreement. By delivery to AFTRA/SAG of this signed Letter of Adherence, the undersigned shall be deemed to have executed and agreed to each of the agreements. The undersigned represents that it has received a copy of each of the agreements referenced above and has read and is familiar with all terms and conditions of said agreements.

It is expressly understood that production under this Letter of Adherence to the *2004-2006 Northwest Regional Code Of Fair Practice* is limited to television and radio commercials which fall under the provisions of Section I, Paragraph 1 of the Code: Commercials made-in and played-in any or all of the following states: Washington, Oregon, Idaho, Montana and Alaska. The territory of said states shall be referred to as "the Region".

It is understood and agreed that the undersigned is bound to the 2003 Screen Actors Guild Television Commercials Contract Memorandum of Agreement, the 2003 AFTRA Television Recorded Commercials Memorandum of Agreement, and the 2003 AFTRA Radio Recorded Commercials Memorandum of Agreement in the event the applicable production airs beyond the Region. Without limiting the generality of the foregoing, the undersigned agrees to all arbitration provisions of the *2004-2006 Northwest Regional Code Of Fair Practice*.

Further, the undersigned agrees to all the health and retirement/pension and health provisions of the *2004-2006 Northwest Regional Code Of Fair Practice* and to be bound by the respective AFTRA Health and Retirement Funds Agreement and Declaration of Trust, dated November 16, 1954, as thereafter amended, and the SAG-Producers Pension and Health Plan Trust Agreements, and to abide by and conform to all of the terms and conditions specified in the aforementioned Trust Agreements, including amendments thereto; and, more specifically, the undersigned hereby appoints the Producer Trustees named therein and/or their successors.

AFTRA and SAG reserve the right to review this Agreement to determine if the undersigned is a bona fide Producer under the appropriate Code, and, to reject the signatory status of any company that is not a legitimate producer.

Company Name: Ed. Renouard Productions

Street: 702 E. Mission Ave.

City: Spokane   State: WA Zip: 99202

Phone: 509.483.8535   Fax: N/A

Fed. Tax ID: 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

Accepted by:

AFTRA Seattle:

AFTRA Portland:

SAG Seattle:

SAG Portland:

Accepted and Approved: _____
*Authorized signature*

Date: 03/29/05

By: (Print name and Title in Company: Ed. Renouard, president

Check one:
Advertiser [ ]   Adv Agency [ ]   Payroll Co [ ]   Music Prod [ ]   Broadcast or cable stn [ ]
Producer [X]   Public Rel Co [ ]   Record Co [ ]   Audio Rec Co [ ]

2004-2006 NW Ltr of Adherence.doc

**"EXHIBIT C"**

# 2003
# COMMERCIALS CONTRACT

# SCREEN ACTORS GUILD



**AND**
# ANA-AAAA JOINT POLICY COMMITTEE
# ON BROADCAST TALENT RELATIONS





cartoon commercial shall be 24 months commencing with the date of the first fixed cycle for the off-camera principal performers.

B.  Where new commercials are created by integration pursuant to the provisions of Section 25, Integrating of Commercials Into Different Commercials, the maximum period of use shall be limited to the same period of time as the original commercial or commercials, unless the principal performer's consent is secured for a full period of use.

C.  The changing of a commercial under any of the provisions of Section 26, Editing of Commercials, shall in no way extend the maximum period of use applicable to any principal performer in the original version of the commercial.

D.  The period of time during which a commercial may be used, specified in subsection A hereof, shall be deemed to be automatically renewed for an equivalent period of time unless any principal performer employed in such commercial shall, not more than 120 days and not less than 60 days prior to the expiration of such period of time, give written notice by mail to the Broadcast Business Affairs Department of the advertising agency named in his/her employment contract or in the Production Report filed by the Producer with the Union at the address shown in such contract or report of such principal performer's election not to grant such right of renewed use. If no advertising agency is named, the notice may be given to the advertiser named in the employment contract or in the Production Report.

Similar renewals for successive equivalent periods of time shall be deemed to be automatically granted, unless any principal performer shall, not more than 120 days and not less than 60 days prior to the expiration of any renewal period of use, give written notice of election not to grant such right of renewal as hereinbefore provided. No person shall have the right to use any commercial after the expiration of the original or any renewal period if any principal performer employed therein shall have given notice of such principal performer's election not to grant such right of renewed use as hereinbefore provided.

E.  No commercial shall be automatically renewed for an additional period of use if any default or delinquency exists in the payment of use fees.

When the right to use a commercial made under a prior contract has terminated or when a commercial made under such prior contract has been withdrawn and the principal performer has been released, such commercial may be reinstated with the express written consent of the principal performer and the execution of a new individual principal performer's agreement subject to the terms and conditions of the Commercials Contract in effect at the time of the reinstatement and new individual agreement. If renewal of use is mutually agreed upon prior to actual date of termination, such renewal agreement shall be made on terms not less favorable than those provided by the Commercials Contract in effect at the time the commercial was made.

F.  The date of expiration of the maximum period of use of a commercial shall be included on each payment voucher with respect to such commercial.

## 31.  HOLDING FEE — FIXED CYCLE

A.  For the purpose of applying the provisions of this Section pertaining to the holding fee, each period of 13 consecutive weeks beginning with the first day of employment of any on-camera principal performer in a commercial is herein referred to as the "fixed cycle".

(See Agreed Interpretation 16, page 148.)

1.  The first fixed cycle for all on-camera principal performers in a commercial shall commence on the earliest day on which services, including rehearsal, are performed in the commercial by any on-camera principal performers. Services such as auditions, fittings and tests shall not be deemed services for purposes of this Section. (See Example 3, subsection H.)

28

2.  The first fixed cycle for all off-camera principal performers in a commercial, who perform services therein not later than 45 days after the date on which the first fixed cycle commences for the on-camera principal performers, shall be the same as that for the on-camera principal performers. This in effect shortens the first fixed cycle for the off-camera principal performer and in all cases the session fee may be credited towards use which commences during such first fixed cycle. The holding fee for the second fixed cycle shall be paid to both on- and off-camera principal performers whether or not use has commenced in the first fixed cycle. (See Example 3, subsection H.)

3.  (a) The first fixed cycle for all off-camera principal performers who perform services in a commercial more than 45 days but not more than 91 days after that date on which the first fixed cycle commences for the on-camera principal performers, shall start with the commencement date of the second fixed cycle for the on-camera principal performers. This in effect lengthens the first fixed cycle for the off-camera principal performer and if use commences prior to the commencement of the second fixed cycle for the on-camera principal performers, then the off-camera principal performer's session fee may be credited towards such use. In such case, the holding fees for the second fixed cycle shall be paid to both on- and off-camera principal performers. However, if use does not occur prior to the commencement of the above-mentioned second fixed cycle, the off-camera principal performer's session fee may be credited towards the holding fee mentioned above. (See Example 4 (a), subsection H.)

    (b) In the event that an off-camera principal performer renders services in a commercial more than 91 days after the date on which the first fixed cycle commenced for the on-camera principal performers, such principal performer's first fixed cycle shall commence on the date on which he/she first rendered services in the commercial or his/her fixed cycle may be brought in phase with the on-camera principal performers' fixed cycles provided such adjustment is not less favorable to the off-camera principal performer and further provided that the maximum use period of such off-camera principal performer shall not be extended by reason of such adjustment.

4.  The first fixed cycle for all off-camera principal performers, who perform services in a commercial not more than 45 days prior to the date on which the first fixed cycle commences for the on-camera principal performers, shall be the same as that for the on-camera principal performers in the commercial. This in effect lengthens the first fixed cycle for the off-camera principal performers and the session fee may be credited towards use which commences during such extended first fixed cycle. (See Example 5, subsection H.)

5.  The first fixed cycle for an off-camera principal performer, who performs services in a commercial more than 45 days but not more than 91 days prior to the date on which the first fixed cycle commences for the on-camera principal performer in the commercial, shall commence on the date of performance of services by such off-camera principal performer and his/her second fixed cycle shall commence and the holding fee shall be due on the date on which the first fixed cycle commences for the on-camera principal performer in such commercial. This in effect shortens the first fixed cycle for the off-camera principal performer and in no case may the session fee be credited towards use. (See Example 6, subsection H.)

6.  The first fixed cycle for off-camera principal performers, who perform voices for animated cartoon commercials or in any other commercials not using on-camera principal performers, shall commence on the date of the first recording session.

7.  The first fixed cycle for all on-camera principal performers and off-camera principal performers, whose services are incorporated into new commercials pursuant to Section 25, Integrating of Commercials Into Different Commercials, shall commence on the first use date of such new commercial or on the date a new contract is signed by the first principal performer, whichever shall first occur.

8.  All principal performers shall be given notice of the date of commencement of their applicable first fixed cycle.

### B.  Holding Fee — Defined — When Credited

Upon the commencement of the first fixed cycle and upon the commencement of each consecutive fixed cycle thereafter throughout the maximum permissible period of use or any extension thereof, a principal performer shall be paid a separate fee, herein called the holding fee, in an amount equal to a session fee and payment of such holding fee to each principal performer, whose services are utilized in the commercial, shall be a condition to Producer's right to continue the use of such commercial.

Separate and individual holding fees shall be paid for each commercial made. (See Example 1, subsection H.)

The holding fee may be credited against the use fees incurred in a 13-week use cycle which commences during the fixed cycle for which the holding fee is paid. (See Example 7, subsection H.)

Similarly, the holding fee may be credited against the use fees incurred for a 6-month dealer use cycle which commences during the fixed cycle for which the holding fee is paid. As provided in Section 31 D 4, Exemptions From Holding Fee, no holding fee is due for the first fixed cycle which commences after the start of the dealer use cycle. However, a holding fee is due for the second fixed cycle which commences after the start of the dealer use cycle and that holding fee may be credited against use fees incurred for a use cycle which commences during that fixed cycle. (See Example 9, subsection H.)

In no case may more than 1 holding fee be credited against use fees incurred in a single cycle of use. (See Example 9, subsection H.)

### C.  Session Fee as First Holding Fee

The session fee shall be deemed the holding fee payable for the first fixed cycle. Such holding fee may be credited against use fees incurred in the first cycle of use, provided that the first cycle of use of the commercial commences not later than 13 weeks after the date of commencement of the principal performer's first fixed cycle. Only one on- or off-camera session fee may be so utilized as a holding fee to be credited against use per commercial. (See Example 1, subsection H.)

### D.  Exemptions from Holding Fee

The holding fee provisions hereof shall not be applicable to the following:

1.  Off-camera solo or duo singers or group performers where no exclusivity is obtained;

2.  Nonidentifiable voices (disguised voices, dialects, cartoon voices or voices used for lip sync.) or vocally produced sound effects;

3.  Nonidentifiable pilots;

4.  The fixed cycle which occurs after the commencement of a 6-month dealer use cycle;

5.  Seasonal commercials, except as provided in Section 39, Seasonal Commercials;

6.  "Non-air" commercials where no exclusivity is obtained from the principal performer;

7.  Announcers in commercial billboards whenever Producer cannot choose an announcer but is required to use the announcer assigned to a program;

8.  Commercials which are made and used only for foreign use;

30

9.  Commercials which have been withdrawn from use in the U.S., its commonwealths, territories, possessions, Canada and Mexico, but which are still being used in foreign areas, provided no exclusivity is required of the principal performer anywhere in the world;

10. Principal performers who have been advised within 15 business days after the commencement of a fixed cycle that their services in a given commercial(s) have been withdrawn from further use;

11. Commercials that are produced for cable transmission only.

### E.  Payment of Holding Fee as Condition of Use

If Producer fails to pay the holding fee on or before the date on which it is due and payable as set forth in Section 43 B, Payment — Holding Fee, all further right of Producer to use the commercial shall cease and terminate, and the principal performer shall thereupon be automatically released from all contractual obligations with respect to the commercial. Inadvertent oversight shall not excuse failure to make timely payments or eliminate the damages provided therefor. If, during the maximum period of use of a commercial, Producer desires to reinstate a commercial after the termination of the right to use the commercial, as above provided, Producer may do so with the written consent of the principal performer in an agreement which may or may not be in the form of the Standard Employment Contract and the payment of not less than two holding fees, one of which may not be credited against use. Any such reinstatement shall be at rates no lower than the minimum contract rates then in effect.

### F.  Producer has the right, within the maximum period of use, to use a commercial through the end of a use cycle without having to pay a holding fee for the subsequent fixed cycle provided that the commercial is withdrawn from use at the end of such use cycle.

### G.  Consecutive Fixed Cycles; Non-Consecutive Use Cycles

Although fixed cycles, as defined in A above, are in all cases consecutive cycles and all requirements of this Section 31 regarding the payment of holding fees related to such consecutive fixed cycles, the cycles of actual use of commercials and the cycles for which use payments must be made need not be consecutive.

### H.  Examples

EXAMPLE 1:

Principal performer works in 3 commercials advertising the same product or different products. The session fee paid for each commercial produced shall constitute the initial holding fee for the first fixed cycle of each individual commercial. A separate holding fee shall be paid for each subsequent fixed cycle per individual commercial. (See Section 31 B and C.)

EXAMPLE 2:

Principal performer works 2 days in one commercial. Only 1 of the 2 session fees principal performer receives may be credited as the holding fee for the first fixed cycle. Subsequent fixed cycles require additional holding fees paid to principal performer. (See Section 31 B.)

EXAMPLE 3:

Principal performer A commences work on-camera in a commercial on January 5 and is paid a $535.00 session fee. Principal performer B commences work on-camera in the same commercial on January 8 and is paid a $535.00 session fee. Principal performer C commences work off-camera on February 15 and is paid a $402.25 session fee. The first fixed cycle commences

31

January 5 for all 3 principal performers since this date was the earliest on which services were rendered by any on-camera principal performer in the commercial. (See Section 31 A 1.)

The commercial is first used on the air April 1 as a Class B Program (not including use in N.Y.) commercial. The session fee is the holding fee for the first fixed cycle and, since the Class B Program cycle commenced within the period of the first fixed cycle (January 5 – April 4) the session fee may be credited toward the use fees of $825.60 for each on-camera principal performer and $573.40 for the off-camera principal performer. Principal performers A and B each receive $290.60 additional and principal performer C receives $171.15 additional for the use cycle. (See Section 31 A 2.)

EXAMPLE 4:

(a) Same facts as Example 3 except that principal performer C, the off-camera principal performer, commences work on February 23. Since this date is 49 days after the first date on which an on-camera principal performer commenced work (January 5), the first fixed cycle for principal performer C is the period April 5 – July 4, which is the second fixed cycle for principal performers A and B. However, since Class B Program use commenced April 1, principal performer C's session fee may be credited against such use. Principal performers A, B and C will be paid the applicable holding fee due April 5, the commencement of the second fixed cycle. There may be no crediting of principal performer C's session fee against his/her holding fee for his/her first fixed cycle inasmuch as the credit was taken against the Class B Program use which commenced April 1. (See Section 31 A 3 (a).)

(b) Same facts as Example 4 (a) except that Class B Program use commences on April 10. In this case, principal performers A and B will be paid the applicable holding fee due April 5, the commencement of their second fixed cycle, and principal performer C's session fee may be considered the holding fee for the fixed cycle commencing April 5. Both A & B's holding fees and C's session fee may be credited towards the Class B Program use.

EXAMPLE 5:

Principal performer A works off-camera on January 5. Principal performer B works on-camera February 5. Since principal performer A has worked fewer than 45 days prior to principal performer B, his/her first fixed cycle commences February 5, the same as principal performer B. Class B program use commences February 10. Both performers' session fees may be credited towards this use. Holding fees for each are due May 5. (See Section 31 A 4.)

EXAMPLE 6:

Principal performer A works off-camera May 5. The first fixed cycle for principal performer A is May 5 – August 4. Principal performer B works on-camera in the same commercial July 7, which is 63 days after principal performer A worked. The fixed cycle July 7 – October 6, principal performer B's first fixed cycle, becomes the second fixed cycle for principal performer A and thereby shortens principal performer A's first fixed cycle in order that all subsequent fixed cycles for both principal performers shall be concurrent starting with the July 7 – October 6 fixed cycle. (See Section 31 A 5.)

EXAMPLE 7:

Principal performer works at scale in a commercial. The first fixed cycle commenced January 6 and ended April 5. On April 6 a holding fee becomes due to principal performer for the second fixed cycle. The commercial is used on April 14 as a Class A Program commercial for a 13-week Class A Program cycle commencing on that date. The holding fee is credited against the fees due to principal performer for the 13-week Class A Program use cycle. (See Section 31 B.)

**EXAMPLE 8:**

Same facts as Example 7, except that the commercial is first used as a Class A Program commercial in a Class A Program use cycle which commenced January 20 and ended April 19. The holding fee for the second fixed cycle becomes due to principal performer on April 6; however, it may not be credited against any Class A use fees which become due between April 6 and April 19, since the Class A use cycle in which such uses occur did not commence within the second fixed cycle. However, the holding fee payable for the second fixed cycle may be credited against any use fees which become due to principal performer with respect to any new cycle of use which commences on or after April 6 and prior to the expiration of the second fixed cycle, for example, a wild spot use cycle commencing on April 12. (See Section 31 B.)

**EXAMPLE 9:**

Principal performer works on-camera January 6. The first fixed cycle for principal performer is January 6 through April 5. On February 12 commercial commences a dealer cycle through August 11. Producer is exempt from payment of the holding fee due on April 6 for the second fixed cycle. However, the principal performer is due a holding fee for the third fixed cycle which commences July 6. This holding fee payment may be credited against any new use cycle which begins on or after July 6, but prior to October 5, the end of the third fixed cycle. (See Section 31 B.)

## 32.  DEFINITION OF WILD SPOT AND PROGRAM USE

The payments to be made to principal performers for use of commercials shall be based upon the kind of use, viz., whether as wild spots or as program commercials and upon the scope of use in each of these categories. A commercial shall be deemed to be used as a wild spot if it is broadcast by noninterconnected single stations and (a) is used independent of any program or (b) is used on local participating programs. All other uses of a commercial, including use as "hitch hikes" and "cow catchers," shall be program uses.

Local participating programs, as the term is used herein, are programs available to more than one advertiser and not "sponsored" by any advertiser and shall not be deemed to include any program which, by the use of phrases such as "sponsored by" or other statements or descriptions, implies that it is sponsored. However, the statement that "the following are participating advertisers" shall not be deemed program sponsorship.

In the event a commercial is used both as a wild spot and as a program commercial, the principal performer shall be paid separately as provided herein, for both kinds of use.

(See Agreed Interpretations 1, 4 and 7, page 147.)

## 33.  WILD SPOTS — COMPENSATION FOR USE

### A.  13-Week Cycles

1.  Compensation for use of wild spots shall be for unlimited use within a cycle of 13 consecutive weeks. The use may be continued for additional cycles of 13 consecutive weeks by paying principal performer the applicable fee for each 13-week renewal cycle.

2.  In view of the fact that a wild spot used in a 13-week campaign may not always be broadcast in all cities on the same schedule and more than 13 weeks may be required for the purpose of conducting a 13-week campaign, it is agreed as follows:

    Although each 13-week cycle of wild spot use shall commence with its first wild spot use, such 13-week cycle shall not be deemed concluded until the commercial has been broadcast 13 weeks in each city; provided, however, that in no event shall such cycle extend for more than 13 weeks in any one city, nor beyond 17 weeks after the first use of the commercial in such cycle in any city.

(See Agreed Interpretation 6, page 147.)

**B.  Unit Weighting**

Weighting is to be applied to all television market areas, defined as "Designated Market Areas" (DMA's) by the Nielsen Media Research Company, with the exception of New York, Chicago and Los Angeles, which are specially treated in subsections E and F of Section 33.

1.  The following TV market areas are weighted as follows for the term of this Contract:

| *Television Market Areas* | *Unit Weight* |
| --- | --- |
| Atlanta | 5 |
| Baltimore | 3 |
| Boston | 6 |
| Charlotte | 2 |
| Cincinnati | 2 |
| Cleveland | 4 |
| Columbus, OH | 2 |
| Dallas-Fort Worth | 6 |
| Denver | 3 |
| Detroit | 5 |
| Grand Rapids-Kalmzoo-B.Crk | 2 |
| Greenville-Spartanburg-Asheville-Anderson, NC | 2 |
| Hartford-New Haven | 2 |
| Houston | 5 |
| Indianapolis | 2 |
| Kansas City | 2 |
| Mexico/Mexico City | 43 |
| Miami | 4 |
| Milwaukee | 2 |
| Minneapolis-St. Paul | 4 |
| Montreal | 4 |
| Nashville | 2 |
| Orlando-Daytona Beach | 3 |
| Philadelphia | 8 |
| Phoenix | 4 |
| Pittsburgh | 3 |
| Portland, OR | 3 |
| Puerto Rico | 3 |
| Raleigh-Durham | 2 |
| Sacramento-Stockton | 3 |
| St. Louis | 3 |
| San Antonio | 2 |
| Salt Lake City | 2 |
| San Diego | 2 |
| San Francisco | 6 |
| Seattle-Tacoma | 4 |
| Tampa-St. Petersburg | 4 |
| Toronto | 7 |
| Vancouver, B.C | 3 |
| Washington D.C | 6 |
| West Palm Beach-Ft. Pierce | 2 |

All other markets are assigned 1 unit each.

2.   The foregoing assignment of unit weights is based upon current "Television Household" figures published by the Nielsen Media Research Company for each DMA. One unit is assigned for each DMA and an additional unit for each full 350,000 Television Households after the first 350,000 in each DMA.

Thus: All markets with 699,999 Television Households or fewer are assigned 1 unit. All markets with 700,000 to 1,049,999 Television Households are assigned 2 units, etc.

## C.   Method of Fee Computation

The payment for wild spot use is computed by:

1.   Determining the maximum number of units in which the wild spot is played during a 13-week cycle, applying the unit weights as set forth in Section 33 B;

2.   Applying the appropriate unit rates as set forth in Section 33 D. When the station lineup on which the commercial is being used includes New York, Chicago or Los Angeles, compensation for such wild spot use shall be determined in accordance with the provisions of Sections 33 E and F;

3.   Totaling the unit costs computed as provided in this Section 33 C 1 and 2.

Table A attached hereto sets forth cumulative totals for use of a wild spot on a station lineup that does not include New York, Chicago or Los Angeles;

Table B sets forth cumulative totals for use of a wild spot on a station lineup which includes New York, together with other cities;

Table C sets forth cumulative totals for use of a wild spot on a station lineup which includes Chicago or Los Angeles together with other cities (excluding New York);

Table D sets forth cumulative totals for use of a wild spot on a station lineup which includes any two of New York, Chicago or Los Angeles together with other cities;

Table E sets forth cumulative totals for use of a wild spot on a station lineup which includes New York, Chicago and Los Angeles together with other cities.

**D.   Wild Spot Unit Rates — Line-up of Cities Not Including New York, Chicago or Los Angeles**

| NUMBER OF UNITS | PRINCIPAL PERFORMERS | | GROUP PERFORMERS | | | | | |
| | On-Camera | Off-Camera | On-Camera | | | Off-Camera | | |
| | | | 3 – 5 | 6 – 8 | 9 & more | 3 – 5 | 6 – 8 | 9 & more |
|---|---|---|---|---|---|---|---|---|
| 1 | $535.00 | $402.25 | $391.65 | $346.75 | $286.75 | $226.90 | $196.90 | $160.55 |
| 2 – 25 add per unit | 18.31 | 12.53 | 14.27 | 12.31 | 10.06 | 5.06 | 3.99 | 3.32 |
| 26 – 60 add per unit | 6.79 | 5.33 | 7.36 | 6.24 | 5.17 | 2.13 | 1.46 | 1.34 |
| 61 – 125 add per unit | 6.79 | 5.33 | 5.33 | 4.16 | 3.49 | 1.29 | .74 | .74 |
| 126 & each unit there-after add per unit | 6.79 | 5.33 | 2.64 | 2.13 | 1.86 | 1.29 | .74 | .74 |

EXAMPLE:

Philadelphia, Detroit and Pittsburgh, plus 22 one-unit cities for 1 cycle, 1 principal performer — *On-Camera*: To determine number of units use subsection B as follows:

Philadelphia ........................................................................................ 8 units
Detroit.................................................................................................. 5 units
Pittsburgh............................................................................................ 3 units
22 one-unit cities ................................................................................ 22 units
Total..................................................................................................... 38 units

To determine unit rates use subsection D as follows:

1st unit ................................................................................................ $535.00
2 – 25 units add $18.31 each unit (24 units x $18.31)....................... 439.44
26 – 37 units add $6.79 each unit (12 units x $6.79) ......................... 81.48

Principal performer's compensation, unlimited use for
13 weeks, On-Camera, totals ............................................................. $1,055.92

**E.   Wild Spot Unit Rates — New York, Chicago or Los Angeles, Singly or in Combination With Each Other (Not Including Other Cities)**

*1.   All Principal Performers (Except Group Performers)*

| | (a) On-Camera | (b) Off-Camera |
|---|---|---|
| New York | $ 1051.35 | $ 742.75 |
| Chicago or Los Angeles | $ 916.40 | $ 646.30 |
| Any 2 of N.Y., Chi., L.A | $ 1,446.85 | $ 974.20 |
| All 3 (N.Y., Chi., L.A.) | $ 1,745.20 | $ 1,239.55 |

2. *Group Performers: On-Camera*

|  | (a) 3 to 5 | (b) 6 to 8 | (c) 9 or more |
|---|---|---|---|
| Any 1 of N.Y., Chi., L.A | $ 673.30 | $ 598.05 | $ 490.05 |
| Any 2 of N.Y., Chi., L.A | $1,035.95 | $ 856.55 | $ 700.30 |
| All 3 (N.Y., Chi., L.A.) | $1,306.95 | $1,118.50 | $ 914.20 |

3. *Group Performers: Off-Camera*

|  | (a) 3 to 5 | (b) 6 to 8 | (c) 9 or more |
|---|---|---|---|
| Any 1 of N.Y., Chi., L.A | $ 270.10 | $ 223.80 | $ 183.25 |
| Any 2 of N.Y., Chi., L.A | $ 356.95 | $ 287.50 | $ 235.40 |
| All 3 (N.Y., Chi., L.A.) | $ 430.35 | $ 347.05 | $ 283.60 |

**F.   Wild Spot Unit Rates — New York, Chicago or Los Angeles, Singly or in Combination With Each Other Together With Other Cities**

1. *All Principal Performers (Except Group Performers)*

|  | (a) On-Camera | (b) Off-Camera |
|---|---|---|
| New York | $ 1051.35 | $ 742.75 |
| Chicago or Los Angeles | 916.40 | 646.30 |
| Additional Cities, add at the rate of: | 6.79 per unit | 5.33 per unit |
| Any 2 of N.Y., Chi., L.A. | 1,446.85 | 974.20 |
| Additional cities, add at the rate of: | 6.79 per unit | 5.33 per unit |
| All 3 (N.Y., Chi., L.A.) | 1,745.20 | 1,239.55 |
| Additional cities, add at the rate of: | 6.96 per unit | 5.45 per unit |

2. *Group Performers: On-Camera*

|  | (a) 3 to 5 | (b) 6 to 8 | (c) 9 or more |
|---|---|---|---|
| Any 1 of N.Y., Chi., L.A. | $ 673.30 | $ 598.05 | $ 490.05 |

Additional cities: When taken in combination with any one of New York, Chicago or Los Angeles, the rate for additional cities is determined by totaling the unit values of the additional cities and applying the following unit rates:

| Units | (a) 3 to 5 | (b) 6 to 8 | (c) 9 or more |
|---|---|---|---|
| 1 – 35 add per unit | $    7.36 | $    6.24 | $    5.17 |
| 36 – 100 add per unit | 5.33 | 4.16 | 3.49 |
| 101 & each unit thereafter | 2.64 | 2.13 | 1.86 |
| Any 2 of N.Y., Chi., L.A. | 1,035.95 | 856.55 | 700.30 |
| Additional cities, add at the rate of: | 2.64 per unit | 2.13 per unit | 1.86 per unit |
| All 3 (N.Y., Chi., L.A.) | 1,306.95 | 1,118.50 | 914.20 |
| Additional cities, add at the rate of: | 2.70 per unit | 2.19 per unit | 1.91 per unit |

3. *Group Performers: Off-Camera*

| | (a) 3 to 5 | (b) 6 to 8 | (c) 9 or more |
|---|---|---|---|
| Any 1 of N.Y., Chi., L.A. | $ 270.10 | $ 223.80 | $ 183.25 |

Additional cities: When taken in combination with any one of New York, Chicago or Los Angeles, the rate for additional cities is determined by totaling the unit values of the additional cities and applying the following unit rates:

| Units | (a) 3 to 5 | (b) 6 to 8 | (c) 9 or more |
|---|---|---|---|
| 1 – 35 add per unit | $   2.13 | $   1.46 | $   1.34 |
| 36 to 100 add per unit | 1.29 | .74 | .74 |
| 101 & each unit thereafter | 1.29 | .74 | .74 |
| Any 2 of N.Y., Chi., L.A. | 356.95 | 287.50 | 235.40 |
| Additional cities, add at the rate of: | 1.29 per unit | .74 per unit | .74 per unit |
| All 3 (N.Y., Chi., L.A.) | 430.35 | 347.05 | 283.60 |
| Additional cities, add at the rate of: | 1.34 per unit | .79 per unit | .79 per unit |

**EXAMPLES:**

1.  Chicago, Detroit, Cleveland and 114 one-unit cities, 1 cycle, 1 principal performer — Off-Camera:

    To determine number of units use subsection B as follows:

    | | |
    |---|---|
    | Chicago | — |
    | Detroit | 5 units |
    | Cleveland | 4 units |
    | 114 one-unit cities | 114 units |

    | | |
    |---|---|
    | Total | 123 units |

    To determine the applicable unit rates for the units additional to the Chicago payment, use subsection F 1 (b), commencing at the unit rate for the 26th unit as follows:

    | | |
    |---|---|
    | Chicago | $646.30 |
    | add 123 units @ $5.33 each | 655.59 |

    Principal performer's compensation, unlimited use for 13 weeks,

    | | |
    |---|---|
    | Off-Camera, totals: | $1,301.89 |

2.  153 cities including New York, Chicago and Los Angeles and all specially weighted U.S. cities, as provided in subsection B hereof, 1 principal performer — On-Camera, 1 cycle:

    | | |
    |---|---|
    | New York, Chicago and Los Angeles | $1,745.20 |

    (Plus additional units at $6.96 each)

    | | | |
    |---|---|---|
    | The 41 specially weighted U.S. cities | 182 units | |
    | 109 one-unit cities | 109 units | |
    | | 291 units @$6.96 | 2,025.36 |

Principal performer's compensation, unlimited use
for 13 weeks, On-Camera, 3 majors plus 291 units totals: ....................................$3,770.56

3.  77 cities including New York, Boston, Washington D.C., St. Louis, Toronto, Montreal and Mexico
City, 1 principal performer — On-Camera, 1 cycle:

To determine number of units use subsection B as follows:

New York  ......................................................................................................... —
Boston  .........................................................................................................6 units
Washington, D.C .........................................................................................6 units
St. Louis ......................................................................................................3 units
Toronto .......................................................................................................7 units
Montreal .....................................................................................................4 units
Mexico City ..............................................................................................43 units
70 one-unit cities.......................................................................................70 units

Total..........................................................................................................139 units

New York ...............................................................................................$ 1,051.35
add 139 units @$6.79 each .........................................................................943.81

Principal performer's compensation, unlimited use for 13 weeks,
On-Camera, totals: ................................................................................$ 1,995.16

## 34.  PROGRAM COMMERCIALS — COMPENSATION FOR USE

### A.  Scope of Use

Compensation for use of program commercials shall be divided into classes as follows:

| Class | Number of Cities in Which Telecast |
|-------|------------------------------------|
| A     | Over 20                            |
| B     | 6 – 20                             |
| C     | 1 – 5                              |

City Weight: In determining the classification for use of program commercials, New York, Chicago and
Los Angeles shall each count as 11 cities; any 2 shall constitute Class A use.

The classification of a commercial as a Class A, B or C Program commercial shall be determined by the
maximum number of different cities including the appropriate weighting set forth above in which it is
telecast during any portion of the applicable use period specified in the schedules below.

However, if during any 13-week cycle of use as a Class B or C Program commercial, the commercial is
telecast as a Class A Program commercial, it shall then be considered as a Class A Program commercial
for the remainder of that cycle. In such event, the principal performer shall be paid for Class A use of such
commercial for the remainder of the cycle in accordance with the applicable rates herein set forth for Class
A use. The Producer may credit the payment due the principal performer for that proportion of the amount
paid the principal performer for Class B or C use as the then unexpired number of weeks in the cycle bears
to 13 weeks. In no event shall the principal performer receive less than the amount due him/her for the
original class of use. For example: A commercial is used as a program commercial on a program which is
telecast in 20 cities for a period of 6 weeks (Class B use). During the 7th week, the program with which the
commercial is used is telecast in an additional city. For the remainder of that cycle, the commercial shall

39

commercial hereunder. Such opening and closing, lead-ins and lead-outs may include reference to the advertiser's name, product or service and "the claim" for such product or service, as the term is commonly understood in the Industry, but may not include any commercial message on behalf of such product or service. The rates for such program openings and closings are the applicable program rates for a single commercial under this Contract, including the applicable guarantees and discounts.

It is the intent of this subsection A that, if the same product or service is referred to in both the opening and closing, the claim made for such product or service may be split to include part in the opening and part in the closing.

B. When a standard program opening and closing and standard lead-in and lead-out is used as such on more than one program series, it shall be deemed a separate commercial for each program series on which it is used and therefore paid for as separate commercials.

One or more elements of a standard opening or closing or a standard lead-in or lead-out may be used separately, in which case each such element shall be deemed a separate commercial and payment for its use shall be computed in the usual manner without any program series restriction.

Openings or closings other than standard openings or closings shall be deemed separate commercials for all purposes hereunder.

C. If, during any cycle during which an opening and closing is being used, either the opening or the closing is remade using the services of the same principal performer as appeared in the original, the principal performer shall be compensated for his/her services in making such new opening or closing and it may be substituted for the original for the remainder of the current cycle.

(See Agreed Interpretation 8, page 147.)

## 39. SIGNATURES — OFF CAMERA

A. Signatures are musical signatures or themes done at the beginning or end, or both, of television programs as customarily understood in the television industry. Signatures are included in the term "commercials" if mention is made of the advertiser's name, product or service.

B. The following are the minimum fees for use of signatures for a 13-week cycle. The use may be continued during additional cycles by paying each singer the same amount as was paid for the original 13-week cycle:

| | |
|---|---|
| Solo and Duo | $1,188.95 |
| Group 3 to 8 | $ 936.25 |
| Group 9 or more | $ 809.90 |

## 40. SEASONAL COMMERCIALS

A seasonal commercial is a commercial which is especially related, by audio or video reference, to a particular "season," such as a commercial designed for use as a Christmas commercial, June Bride commercial, Valentine's Day commercial, Bock Beer commercial, Spring changeover commercial, etc.

If a principal performer is engaged for a seasonal commercial, it shall be so stated in his/her contract.

All the terms and conditions of this Contract shall apply to seasonal commercials except as follows:

A. A seasonal commercial may be used for a period not to exceed one 13-week cycle, plus an optional contiguous period of not more than 2 consecutive additional weeks in the next cycle, in a season. If the commercial is used for more than such period, it shall not qualify as a seasonal commercial.

B. The maximum period of permissible use of a seasonal commercial for all categories of principal performers shall be 2 consecutive seasons, provided the commercial is used as a seasonal commercial in the first season. Additional periods of use may be obtained with the consent of the principal performer.

C. If Producer intends to use a commercial as a seasonal commercial for a second season, the principal performer shall be paid a holding fee, which shall not be credited. Such holding fee shall be due 12 working days after the end of the 13-week (or optional 15-week) period and, if not so paid, the right of Producer to use the commercial shall terminate.

D. Where Producer continues the use of the seasonal commercial beyond the first cycle, applicable use fees for use in the second cycle shall be payable and no part of such fees paid for the second cycle may be credited against the holding fee required by subsection C hereof to hold the use of the commercial for an additional season.

E. No exclusivity may be acquired by Producer with respect to the principal performer's employment in seasonal commercials. If exclusivity is acquired by Producer, the commercial shall not qualify as a seasonal commercial.

## 41. FOREIGN USE OF COMMERCIALS

### A. Use Fees

It is the intention hereof to provide rates for the exhibition of commercials made under this Contract when exhibited in foreign use, i.e., outside the United States, its commonwealths, territories and possessions, Canada and Mexico, whether such use is in addition to domestic use or solely for foreign use.

If Producer wishes to acquire the right to exhibit commercials outside the United States, its commonwealths, territories and possessions, Canada and Mexico, the individual principal performer's contract shall contain a provision granting such right at additional compensation to the principal performer of not less than the following amounts:

1. For use in the United Kingdom (England, Scotland, Wales and Northern Ireland), an amount not less than triple the session fee;

2. For use in Europe other than the United Kingdom, an amount not less than 2 additional session fees;

3. For use in the Asian-Pacific zone (Australia, China, Hong Kong, India, Indonesia, Korea, Malaysia, New Zealand, Pakistan, Philippines, Singapore, Taiwan, Thailand), an amount not less than an additional session fee;

4. For use in Japan, an amount not less than an additional session fee.

5. For use anywhere in the world outside of the United Kingdom, Europe and the Asian-Pacific zone, an amount not less than an additional session fee;

The applicable amounts payable for such foreign use shall be due and payable upon the first use of a commercial in each of the aforementioned areas. Such payment shall cover all such uses within a single period of maximum use as defined in Section 30, Maximum Period of Use of Commercials. Separate additional fees shall be payable for each renewed period of maximum use.

### B. Maximum Period of Use

1. Except as provided in Paragraph 2 of this subsection B, foreign use of commercials shall be subject to the provisions regarding maximum permissible period of use as set forth in Section 30, Maximum Period of Use of Commercials.

2. Producer has the option at any time during the maximum period of use to extend foreign use rights for 9 months beyond the 21-month maximum period of use upon payment of not less than an additional 50% of the appropriate foreign use fee(s) for the area(s) in which the commercial is to be used, subject to the following conditions:

(a) Exclusivity shall not apply to principal performers in a commercial which is no longer being used or held domestically;

(b) Producer may not exercise the option to extend foreign use rights after the principal performer has served notice of termination pursuant to Section 30 D;

(c) A notice given by a principal performer pursuant to Section 30 D with respect to any commercial for which the extension option has been exercised shall also serve as notice with respect to the right of foreign use beyond the extended foreign use period.

C. Producer shall promptly notify the Union, in writing, of any release of a commercial for foreign use which requires payment under the provisions of this Section.

D. In the event a commercial is made solely for foreign use and is so used, only one on or off-camera session fee as is appropriate may be credited against such foreign use.

## 42. THEATRICAL OR INDUSTRIAL EXHIBITION

If Producer desires to use a commercial for theatrical or industrial exhibition, the individual principal performer's contract shall contain a provision requiring additional compensation for such right of not less than 100% of the applicable session fee for all categories of principal performers payable when such exhibition occurs and shall constitute payment for 30 consecutive days following the first exhibition. An additional 60% of the applicable session fee shall be payable for any additional use which occurs beyond the 30th day.

Payment for use of a commercial on a videocassette, laser disc, DVD, CD or like formats that is given, sold, or rented to the public shall be not less than 320% of the applicable session fee.

Such payments shall cover all such use within a single period of maximum use as defined in Section 30, Maximum Period of Use of Commercials. Separate additional fees in such amounts shall be payable for theatrical or industrial exhibition for each renewal period during which the commercial is used hereunder.

Notwithstanding the foregoing, no payment shall be required for use of commercials at toy fairs which are not open to the general public if the principal performer has been paid not less than the minimum compensation provided in Section 20. Principal performers in commercials produced under Section 19 shall be paid the difference between the non-air rate and session fee.

## IV. GENERAL TERMS

## 43. PAYMENT

Payments to each principal performer shall be made as follows:

### A. Session and Audition fees

Payment of session for services rendered for each commercial shall be made not later than 12 working days after the day or days of employment and for any audition payments due, not later than 12 working days after the day or days of audition.

### B. Holding Fee

Payment of the holding fee shall be made not later than the first day of the fixed cycle for which it is payable.

### C. Local Program Commercials (Special Class B, Class B and Class C)

The applicable payment for each cycle of use shall be made not later than 15 working days after the date of first use in such cycle.

### D. Wild Spots

The applicable payment for each cycle of use shall be made not later than 15 working days after the date of first use in such cycle, except that adjustments for unit compensation not ascertainable at the time of first use shall be paid in full not later than 15 working days after the completion of such cycle.

### E. Class A Program Commercials

Payment for all Class A Program uses that occur within a single week from Monday through Sunday shall be made not later than 15 working days after the end of such week.

### F. Foreign Use

Payment for foreign use shall be made not later than 15 working days after the date of first use in any foreign market.

### G. Program and Wild Spot Use Under Schedule C – Spanish Language Commercials

Payments for Program and Wild Spot use cycles under Schedule C – Spanish Language Commercials, are due not later than 15 working days after the date of first use in such cycle, except that adjustments for wild spot unit compensation not ascertainable at the time of first use shall be paid in full not later than 15 working days after the completion of such cycle.

### H. Guarantees

The discounts permitted for guarantees shall be applicable only when the guarantee is made prior to the first use and is paid in full within 12 working days after the guarantee is given to the principal performer. Additional uses beyond those to which the guarantee applies shall be paid not later than 15 working days after the end of the week in which such use occurred, as provided in subsection E hereof. Payments shall be deemed made upon receipt by the principal performer or upon posting in the United States mail.

### I. Foreign Currency

In any case where payment is made in foreign currency such payments shall be adjusted to the proper rate of exchange so that in no case shall the principal performer receive less than the equivalent in U.S. dollars of the minimums required by the Contract.

### J. Adjusting Undisputed Overpayments

1. Where an overpayment has been made to a principal performer and there is no factual dispute with respect to such overpayment, the Union will cooperate with Producer to have the principal performer return the incorrect payment to Producer as promptly as possible. Alternatively, the overpayment may be credited against subsequent payments due to the same principal performer under the following circumstances:

   (a) The overpayment and subsequent payments are made for the same advertising agency.

   (b) The overpayment and subsequent payments are made on behalf of the same advertiser even if the advertising agencies are not the same.

2. Subject to the conditions and limitations set forth below, other payments due under this Contract may be applied to recoupment of an overpayment made under this Contract by a different advertising agency (where the same advertiser is not involved) if, in an initial letter to the principal performer,

59

Producer identifies the overpayment as to the amount, date, commercial, advertiser and agency involved and:

(a) Producer obtains written authorization from the principal performer in response to the initial letter; or

(b) Producer sends a second notice to the principal performer with a copy to the Union no later than 90 days after the initial notice by registered or certified mail, return receipt requested, and the principal performer does not object in writing within 30 days after delivery of Producer's second notice. Under this paragraph (b), Producer may not reduce the gross amount of any subsequent payment by more than 25%.

At the time of recoupment, Producer shall identify the payment from which the overpayment is being recouped, including the amount of such payment, nature (session fee, use fee, etc.), the commercial advertiser and agency involved.

3. The Union will continue its existing policy to assist Producers in adjusting overpayments in accordance with the above guidelines. In those instances where a Producer and a principal performer are unable to agree upon an arrangement, the Union will, at Producer's request, actively participate in an effort to resolve the matter.

4. Claims for overpayment shall be barred if not made within 6 months after the date of overpayment.

## 44. OVERSCALE PAYMENTS AND GUARANTEES

A. No compensation in excess of the minimum amounts provided for in this Contract paid to a principal performer for his/her services in making a commercial or for any use or period of use thereof may be credited by the Producer or advertiser against any use fees payable to such principal performer, unless there is a specific provision in writing to that effect in the principal performer's individual contract of employment. Except as above provided, there may be no crediting of overscale compensation.

B. Where a principal performer is guaranteed in his/her contract a fixed sum of money, principal performer may agree to credit against such fixed sum compensation for making commercials, use fees and holding fees.

C. Where a principal performer is guaranteed a fixed sum of money against which use fees are to be credited, and permissible edits or integrated commercials are produced utilizing photography or sound track edited or integrated from materials made for the commercial(s) originally produced under the principal performer's contract, all applicable payments required for such edited or integrated commercials may be credited against the principal performer's guarantee in the same manner and at the same rate as for the original commercial(s).

D. With respect to stunt performers, no overscale payment for performing a stunt in a commercial may be credited against any use fees.

## 45. LIQUIDATED DAMAGES FOR LATE PAYMENT

A. In the event Producer fails to make timely payment, as herein provided, the following cumulative liquidated damage payments shall be due and payable to the principal performer for each day beginning with the day following the date of default: $3.00 per day up to 25 days (excluding Saturdays, Sundays and holidays which Producer observes) up to a maximum of $75.00. Thereafter, the liquidated damages payment shall cease unless either the Union or the principal performer gives written notice to Producer of nonpayment. In the event such notice is given and full payment, including accrued liquidated damages, is not made within 12 working days thereafter, the Producer shall be liable for an immediate additional liquidated damages payment of $75.00 plus further liquidated damage payments at the rate of $10.00 per day from the date of the receipt of notice of nonpayment, which shall continue without limitation as to time until the delinquent payment together with all liquidated damages are fully paid. Such liquidated

damages shall be in addition to any and all other remedies which the Union may have against Producer under this Contract.

The liquidated damages herein provided shall not be invoked if the principal performer is at fault for failure to execute his/her W-4 Form or other required tax forms or if the principal performer, having been furnished an engagement contract on or before the date of employment, fails to return the signed contract promptly, or when there is a bona fide dispute as to compensation.

B.  In the event of a claim, any undisputed sums due and payable to principal performer shall nevertheless be paid within the time periods specified in Section 43, Payment. Failure to make timely payment shall activate the liquidated damages provisions hereof.

C.  Liquidated damages for late payment shall accrue commencing 12 business days after the settlement of a disputed claim.

D.  In the event Producer fails to make timely payments as required hereunder, the Union may, by written notice, require the payment of session fees, use fees and other fees to be sent to principal performers in care of a designated Screen Actors Guild office.

## 46. CONTRIBUTIONS TO PENSION AND HEALTH PLANS

A.  Producer and advertising agencies signatory to Letters of Adherence, shall become parties to the "Screen Actors Guild-Producers Pension Plan for Motion Picture Actors" and "Screen Actors Guild-Producers Health Plan for Motion Picture Actors" and to the "Industry Advancement and Cooperative Fund" ("IACF"). Producers shall contribute an amount equal to 14.30% of all gross compensation paid to principal performers as herein defined with respect to television commercials produced on and after October 30, 2003. Such contribution shall be allocated as follows: 0.3% to the IACF and 14% to the Pension and Health Plans. Of such 14%, 4.75% will be allocated to the Pension Plan and 9.25% to the Health Plan. The allocation of the 14% between the Health Plan and the Pension Plan may be changed at any time during the term hereof by the Boards of Trustees of said Plans based on actuarial studies.

B.  This Section 46 applies with respect to extra performers employed in accordance with Schedule D.

C.  The term "gross compensation" as used in this subsection A means all salaries, session fees and other compensation or remuneration including holding fees and use fees, foreign use payments and theatrical or industrial use payments; excluding however, allowances; payments for meal period violations; rest period violations; traveling, lodging, or living expenses; liquidated damages for late payments; flight insurance allowance; reimbursements for special hairdress or for wardrobe maintenance or damage to wardrobe or personal property; but without any other deductions whatsoever. Such term also includes amounts paid to an employee with respect to services as a principal performer or as an extra performer ("performer") (including compensation paid as salary settlements) whether or not any services were performed.

D.  If, during the term of this Contract, the Union negotiates a higher rate of employer contributions than 14.30% with the AMPTP or any successor organization, for its theatrical and TV film contracts, this Contract may be reopened for negotiations with respect to pension and health contributions only.

E.  Where Producer borrows acting services from a signatory loan-out company, or enters into a contract with a principal performer under which covered services and noncovered services are to be provided, the following shall apply:

1.  There will be a separate provision in principal performer's agreement or loan-out agreement covering only acting services. Where other services are involved and there is a dispute over the portion of the compensation allocated to acting services, the principal performer's "customary salary" shall be given substantial consideration in resolving such dispute.

2.  Contributions shall be payable on the amount allocated to covered services.

61

3. The Producer shall have the obligation to make the contributions directly to the Plans whether the agreement is with the principal performer or with the principal performer's loan-out company.

4. If, prior to the date on which Producer assumed the obligation to make the contributions directly to the Plans, a loan-out company has failed to make the applicable pension and health contributions on behalf of the loaned-out principal performer pursuant to the provisions of any applicable SAG Commercials Contract, Producer shall not be liable for such contributions if the loan-out company failed to pay such contributions more than 4 years prior to the date of commencement of the audit that gives rise to the claim (whether or not it is of the loan-out company's records or the borrowing Producer's records). The date of commencement of the audit shall be deemed to be the date of actual audit entry, but in no event later than 90 days after the date of the Plans' notice of intent to audit. In the event that the Plans conclude, based on an audit of a loan-out company's records, that there exists a claim for unpaid contributions, the Plans or the Union must give the borrowing Producer written notification of any such claim for unpaid contributions at the time that the loan-out company is notified of such claim.

5. Claims against Producer for pension and health contributions on behalf of principal performers borrowed from a loan-out company, or claims against Producer on behalf of principal performers employed directly by the Producer, must be brought within 4 years from the date of filing of the compensation remittance report covering such principal performers.

6. Any claim for contributions not brought within the 4-year period referred to in subsections F 4 and 5 above shall be barred.

F. It is understood that the Pension and Health Plans are industry-wide and open to all Producers and advertising agencies signatory to any of the Union's collective bargaining contracts or Letters of Adherence thereto which provide for payments to the Plans as above set forth. By signing a Letter of Adherence to the Trust Agreement hereinafter referred to and upon acceptance by the Trustees, Producers and advertising agencies shall be deemed bound by the terms and conditions of the Plans and to have appointed the Producers' Trustees and Alternate Trustees previously appointed.

G. The funds contributed to the Pension Plan and the Health Plan shall be trust funds and shall be administered under the Screen Actors Guild-Producers Pension Plan Agreement, and the Screen Actors Guild-Producers Health Plan Trust Agreement both dated February 1, 1960, which Agreements and Declarations of Trust shall become part of the collective bargaining contract. The Trust Fund for the Pension Plan shall be used solely for the purpose of providing pension benefits for employees covered by the Union's collective bargaining contracts in the motion picture industry who are eligible for benefits under the Pension Plan and for expenses in connection with the establishment and administration of such Pension Plan. The Trust Fund for the Health Plan shall be used solely for the purpose of providing welfare benefits for employees covered by the Union's collective bargaining contracts in the motion picture industry who are eligible for benefits under the Health Plan, and in the discretion of the Trustees for their families, and for expenses in connection with the establishment and administration of such Health Plan.

The Trustees shall determine the form, nature and amount of Pension and Health benefits, respectively, the rules of eligibility for such benefits and the effective dates of such benefits.

H. The Plan of pension benefits shall be subject to the approval of the Internal Revenue Service as a qualified Plan. If any part of the Plan is not approved, the Plan shall be modified by the Trustees to such form as is approved by the Internal Revenue Service.

I. The Declarations of Trust shall provide that no portion of the contributions thereof may be paid or revert to any Producer.

J. Producers and advertising agencies shall furnish the Trustees of each Plan, upon request, with the required information pertaining to the names, job classification, Social Security numbers and wage information for all persons covered by this Contract, together with such information as may be reasonably required for the

proper and efficient administration of the Pension Plan and the Health Plan, respectively. Upon the written request of the Union to the Producer, such information shall also be made available to the Union.

K. No part of the Producer's contributions to such Plans may be credited against the performer's overscale compensation or against any other remuneration that the performer may be entitled to, no matter what form such other remuneration may take nor shall such contributions constitute or be deemed to be wages due to the individual employees subject to this Contract, nor in any manner be liable for or subject to the debts, contracts, liabilities or torts of such employees.

## 47. SOCIAL SECURITY, WITHHOLDING, UNEMPLOYMENT AND DISABILITY INSURANCE TAXES

Session fees, holding fees, use fees and all other compensation paid to principal performers and all compensation paid to extra performers covered by this Contract for or in connection with the making and use of commercials constitute wages and as such are subject to Social Security, withholding, unemployment insurance taxes and disability insurance taxes. Advertising agencies or others, such as production companies, payroll agencies or loan-out companies, who assume the contractual obligation to make such payments shall also make the required payments, reports and withholding with respect to such taxes. Nothing herein shall relieve the Producer or Union of their respective obligations under this Contract.

The period of service for which compensation is ordinarily paid to principal performers covered by this Contract is a 13-week period. The "part-year employment method" of withholding as currently set forth in Section 31 — 3402(h)(4)-1(C) of the Internal Revenue Code and Regulations or any applicable successor Regulations, shall be utilized for any principal performer upon his or her request provided that the principal performer qualifies for such method of withholding under the Internal Revenue Code and Regulations and the form of declaration for each such use shall be attached to the principal performer's employment contract.

If Producer withholds taxes or makes any other payroll deductions which are not required or are in excess of the amount required by U.S. State or Federal law, Producer shall promptly reimburse the principal performer and the extra performer ("performer") the entire amount erroneously withheld upon performer's request and appropriate documentation, provided that the request is made during the then current calendar year.

## 48. PRINCIPAL PERFORMER'S RIGHTS VESTED

The right of a principal performer to compensation for the use of a commercial shall be a vested right and shall not be affected by the expiration of this Contract or by any act on the part of the Producer.

## 49. CONTRACT INCORPORATED IN PERFORMER'S INDIVIDUAL CONTRACT; WAIVERS

A. The applicable provisions of this Contract shall be deemed incorporated in the individual contract of employment between Producer and each principal performer or extra performer ("performer") and Producer and the performers shall each be bound thereby as to all services performed after the effective date hereof. Nothing contained in this Contract shall be construed to prevent any performer from negotiating with and obtaining from any Producer better terms than are provided herein.

B. No waiver by any performer of any of the applicable terms of this Contract shall be requested of the performer or become effective unless the consent of the Union is first had and obtained. Such consent may be oral, but the Union agrees that all oral waivers will be confirmed in writing by it. Whenever the Producer is entitled to a waiver, the Union agrees to issue the same without cost.

\*COMMERCIALS COVERED BY THIS AGREEMENT:

| TITLE AND I.D. NUMBER | PRODUCT | SESSION DATE |
|---|---|---|

*(List all other commercials on reverse side of this form)*

| | |
|---|---|
| *(Company Name of Transferor)* | *(Company Name of Transferee)* |
| *(Signature of Officer)* | *(Signature of Officer)* |
| *(Type Officer's Name and Title)* | *(Type Officer's Name and Title)* |

DATE: _____        DATE: _____

---

FINANCIAL INFORMATION: (Needed only if Transferee is not signatory to SAG Commercials Contract)

Transferee's Bank: Name _____        Branch: _____

Address: _____        Fax: _____

Phone: _____        Staff Referral: _____        Acct. #: _____

---

APPROVED FOR SCREEN ACTORS GUILD

BY: _____        DATE: _____

B.  Where a Producer produces a commercial hereunder for an advertising agency signatory to this Contract or a Letter of Adherence hereto:

1.  The advertising agency shall guarantee payment of the applicable session fee for such commercial;

2.  The advertising agency shall make all payments of holding fees and use fees and otherwise comply with this Contract with respect to such commercial;

3.  The Producer shall not be responsible to the Union or any Union member for any payments of holding fees and use fees or for any breach or violation of this Contract by the advertising agency; and

4.  The agreement set forth in subsection A of this Section 55 need not be obtained.

## 56. LETTERS OF ADHERENCE

The term "Producer," as used in this Contract, includes advertising agencies who sign Letters of Adherence. Such Letters of Adherence shall constitute a binding obligation of any such advertising agencies and shall be delivered to the Union and shall be in the following form from authorizers to the Joint Policy Committee.

Dated _____

Dear Sirs or Ms.:

We acknowledge receipt of a copy of the Screen Actors Guild 2003 Commercials Contract and we are familiar with its terms. We join in the desire to promote stability in the Industry and to maintain harmonious relations with the Screen Actors Guild and its members. To that end, we hereby become a party to and agree to abide by and conform to all of the terms and conditions of the aforementioned Commercials Contract on our own behalf and on behalf of advertisers for whom commercials are produced by or through our agency.

Without limiting the generality of the foregoing, we agree expressly for the benefit of Screen Actors Guild and all persons covered by the terms of the aforementioned Commercials Contract that we will make the payments of holding fees and use fees for commercials as provided in the aforementioned Contract, and that we will make all Social Security, withholding, unemployment insurance and disability insurance payments required by law with respect to said payments. It is further agreed that we will make all appropriate contributions to the Screen Actors Guild-Producers Pension and Health Plans required under the aforementioned Commercials Contract with respect to such payments. It is expressly understood and agreed that our right to telecast such commercials shall be subject to and conditioned upon prompt payment by us of such use fees and other payments, and the Union shall be entitled to injunctive relief in the event such payments are not made.

Very truly yours,

_____
*(Advertising Agency)*

By _____

Address _____

## 57. ARBITRATION

All disputes and controversies of every kind and nature whatsoever between any Producer and the Union or between any Producer and any principal performer and extra performer ("performer") arising out of or in connection with this Contract, and any contract or engagement (whether overscale or not and whether at the minimum terms and conditions of this Contract or better) in the field covered by this Contract as to the existence, validity, construction, meaning, interpretation, performance, nonperformance, enforcement, operation, breach, continuance, or termination of this Contract and/or such contract or engagement, shall be submitted to arbitration in accordance with the following procedure:

A. The Union, acting on its own behalf or on behalf of any person employed under this Contract, or the Producer concerned, may demand such arbitration in writing. The parties shall thereupon endeavor to agree upon a single qualified arbitrator acceptable to them both. If the parties cannot agree upon a single qualified person within 5 working days after the demand for arbitration, the party demanding arbitration shall serve upon the other a notice which shall include the name of the arbitrator appointed by the party demanding arbitration. Within 3 working days after such notice, the other party shall name its arbitrator, or in default of such appointment, such arbitrator shall be named forthwith by the Arbitration Committee of the American Arbitration Association ("AAA") and the 2 arbitrators so selected shall name a third within a period of 5 working days and in lieu of their agreement upon such third arbitrator, he/she shall be appointed by the Arbitration Committee of the AAA. Each party shall bear its own arbitration expenses.

The parties have agreed to the use of a predetermined list of arbitrators, which list shall be maintained by the AAA. Upon receipt of written notice from a party requesting arbitration, the AAA will select, from the list, in random order, a single arbitrator to hear the case. However, if the arbitrator so selected is not available within 21 days of the date of the notice to the AAA, the AAA will make another random selection from the list. If no arbitrator on the list is available within 21 days, the AAA will select from the list that arbitrator who is available on the earliest date.

The parties shall send a joint letter to the AAA informing it of the above process and the initial panel of arbitrators agreed upon. This panel may be increased or decreased from time to time by mutual agreement of the parties. Until such time as the parties have agreed upon a panel of single arbitrators for use in any area in which the Union maintains a branch or office, the foregoing provisions shall be applicable to the selection of arbitrators.

B. The hearing shall be held on 10 working days' notice and shall be concluded within 14 days unless otherwise ordered by the arbitrator(s). The arbitration award shall be made within 7 days after the close of the submission of evidence, shall be final and binding upon all parties to the proceeding and judgment upon such award may be entered by any party in the highest court of the forum, State or Federal, having jurisdiction.

C. The word "Producer" as used in this Contract includes any third person to whom a commercial has been sold, assigned, transferred, leased or otherwise disposed of. Any Producer including such third party "Producer" may file with the Union the name and address of an available person in New York City, or in Los Angeles, upon whom service of a demand for arbitration and other notices and papers under this Section may be made. If such name and address is not on file with the Union, or if although on file the named person is not available, the Producer irrevocably appoints the Secretary of the AAA as his/her agent to accept service and receive all notices, demands for arbitration and service of process in actions on the award in any suit by the Union or Union members. Producer further agrees that such notices, demands for arbitration and other process or papers may be served on the foregoing persons by registered mail sent to their last known address with the same force and effect as if the same had been personally served.

D. The parties agree that the provisions of this Section shall be a complete defense to any suit, action or proceeding instituted in any Federal, State or local court or before any administrative tribunal with respect to any controversy or dispute which arises during the period of this Contract and which is therefore arbitrable as set forth above. The arbitration provisions of this Contract shall, with respect to such controversy or dispute, survive the termination or expiration of this Contract.

E. The Union shall be an ex-officio party to all arbitration proceedings hereunder in which any performer is involved and may do anything which a performer named in such proceeding might do. Copies of all notices, demands and other papers filed by any party in arbitration proceedings and copies of all motions, actions or proceedings in court following the award shall be promptly filed with the Union.

F. Nothing herein contained shall be deemed to give the arbitrator(s) the authority, power or right to alter, amend, change, modify, add to or subtract from any of the provisions of this Contract.

G. It is the policy of the Union not to process unduly late claims.

See Sideletter No. 2, page 151.

## 58. NO STRIKE CLAUSE

Part III of Schedule B hereof, entitled "Strikes", is by this reference incorporated herein and made a part hereof.

## 59. NOTICES

All notices which the Producer desires or is required to send to a principal performer shall be sent to not more than 2 addresses which the principal performer may designate, one of which shall be the address which principal performer designates for the sending of payments on his or her Standard Employment Contract. The Standard Employment Contract shall provide a place for inserting the address to which notices shall be sent to principal performer and to Producer.

Principal performer and Producer shall notify the other in writing of any changes in address from those specified on the Standard Employment Contract.

74

**"EXHIBIT D"**

LEGAL DEPARTMENT



WRITER'S DIRECT DIAL:
(323) 549-6623

WRITER'S E-MAIL:
bchavez@sag.org

## VIA U.S. AND CERTIFIED MAIL

August 13, 2009

Agent for Service of Process
Ed Renouard Productions
702 E. Mission Ave.
Spokane, WA 99202

Mr. Ed Renouard
Ed Renouard Productions
702 E. Mission Ave.
Spokane, WA 99202

**Re:    Tracy Jewelers, "*Lady In Red*"**
**SAG Case No. TM 4569**

Dear Party Representatives:

Enclosed please find the Statement of Claim and Demand for Arbitration in the above-referenced matters.  Please contact me by August 27, 2009 so we can attempt to resolve this matter informally.

Otherwise, pursuant to the relevant collective bargaining agreement, please contact me within 15 days to select an arbitrator.

I look forward to speaking with you soon.

Sincerely,

Bonnie Chávez
Counsel

Enclosure

1  Bonnie Chávez (SBN 198124)
   Counsel
2  Screen Actors Guild, Inc.
   5757 Wilshire Boulevard, 8th Floor
3  Los Angeles, California 90036-3600
   Telephone: 323.549.6623
4  Facsimile: 323.549.6624

5  Attorney for Claimant

6

7

8              BEFORE THE PRODUCER-SCREEN ACTORS GUILD

9                    SOLE NEUTRAL ARBITRATOR

10

11  SCREEN ACTORS GUILD, INC., a non-profit
    corporation, on behalf of Affected Performers, 20      Case No.: TM 4569
12  Doe Performers,
                                                           STATEMENT OF CLAIM AND
13              Claimant,                                   DEMAND FOR ARBITRATION

14  v.

15  ED RENOUARD PRODUCTIONS,

16              Respondent.

17  Re:  Tracy Jewelers, "*Lady in Red*"

18          The Screen Actors Guild, Inc. ("Guild") submits this dispute to arbitration pursuant to

19  Section 57 of the Screen Actors Guild 2003 Commercials Contract, as amended ("Contract").

20  The basis of the dispute, material facts, position of the Guild, and relief sought are stated in this

21  dispute. Section 57.A. of the Contract, as modified, explains the procedures for arbitrating this

22  dispute:

23          The parties shall thereupon endeavor to agree upon a single qualified arbitrator
            acceptable to them both.  If the parties cannot agree upon a single qualified
24          arbitrator within ten (10) working days after the demand for arbitration, or such
            later date as the parties may mutually agree to, the American Arbitration
25          Association ("AAA") office located in the city where such demand has been made
            or any other city to which the parties mutually agree to, shall appoint the
26          arbitrator . . . .

27

28

                                            - 1 -

                    STATEMENT OF CLAIM AND DEMAND FOR ARBITRATION

To facilitate selection the Guild submits the following list of prospective arbitrators: Sara Adler, Wayne Estes, Fred Horowitz, and Sol Rosenthal. The Guild requests that the arbitration be held at its office located at 5757 Wilshire Boulevard in Los Angeles, California.

### ARBITRATION CLAIM

#### Allegations Common to All Counts

1.      Producer ED RENOUARD PRODUCTIONS ("ERP") is signatory to or otherwise bound to the Contract.

2.      During the term of the Contract, ERP produced a seasonal jewelry commercial for Tracy Jewelers entitled, *"Lady in Red"* ("Commercial").

3.      ERP employed Guild member, Courtney Henggeler ("Performer") to perform services on the Commercial in accordance with the Contract.

4.      Upon information and belief, the Commercial has been exhibited for a second season in 2008 which pursuant to Section 40.C. of the Contract requires that the Performer be paid a holding fee.

5.      Pursuant to Section 32 and 33 of the Contract, Performer is also due use fees.

6.      On or about October 1, 2008, November 7, 2008, December 11, 2008, and again on January 29, 2009, the Guild sent claim letters to ERP notifying ERP of the dispute.

7.      The Guild demands that Respondent pay the holding fee and use fees due to Performer in the Commercial.

8.      Further, Liquidated Damages for Late Payment in the amount of $150.00 plus $10.00 per day from the date of notice of nonpayment on October 1, 2008 are also due *and accruing* on this claim, pursuant to Section 45 of the Contract.

9.      Respondent shall pay all appropriate pension and health payments on the amounts owed.

10.     Conciliation having been attempted without success, arbitration of this dispute is hereby requested.

11.     The Guild expressly reserves its right to allege such further injuries, and to request

- 2 -

1    the appropriate damages, as may be discovered in the future in connection with this Demand.

2

3           **WHEREFORE**, the Guild seeks the following award against Respondent:

4           1.     An order finding Respondent to be in breach of Sections 40.C., 32, 33, and 45 of

5    the Contract;

6           2.     An order requiring Respondent to send checks to the Guild, made payable to

7    Performer individually, for compensation owed to Performer per the above-stated conditions,

8    including but not limited to Liquidated Damages, less all withholdings in accordance with the

9    Contract;

10          3.     An order requiring Respondent to send a check to the SAG-Producers Pension

11   and Health Plans for all pension and health payments due to Performer;

12          4.     An order granting the Guild an irrevocable assignment of any and all monies

13   owed to Respondent from the worldwide exploitation, distribution, exhibition, or other use of

14   the Commercial until the amounts awarded are paid in full;

15          5.     A declaration that Respondent is in default under the terms of the Contract by,

16   *inter alia*, failing to report and pay amounts due in accordance with the Contract;

17          6.     An order requiring Respondent to pay other damages, including, but not limited

18   to, all expenses incurred by the Guild to obtain and review records necessary for determining the

19   amounts due under this claim;

20          7.     All costs and fees incurred by the Guild in this arbitration; and

21          8.     Such other and further relief as the Arbitrator deems proper.

22

23   Dated: August 13, 2009

24                                          **BONNIE CHAVEZ**
                                            Counsel
25                                          Screen Actors Guild, Inc.

26                                          Attorney for Claimant

27

28

                                            - 3 -

                     STATEMENT OF CLAIM AND DEMAND FOR ARBITRATION

1   Bonnie Chavez (SBN 198124)
    Counsel
2   Screen Actors Guild, Inc.
3   5757 Wilshire Boulevard, 8th Floor
    Los Angeles, California 90036-3600
4   Telephone: (323) 549-6623
    Facsimile:  (323) 549-6624
5

6   Attorney for Claimant

7                BEFORE THE PRODUCER-SCREEN ACTORS GUILD

8                      SOLE NEUTRAL ARBITRATOR

9

10  SCREEN ACTORS GUILD, INC., a non-profit          Case No.: TM 4569
    corporation, on behalf of Affected Performers, 20   PROOF OF SERVICE
11  Doe Performers,

12                     Claimant,

13  v.

14  ED RENOUARD PRODUCTIONS,

15                     Respondents.

16

17

18  Re: Tracy Jewelers, ":*Lady in Red*"

19          I, Marcy Reed, declare:

20          I am, and was at the time of the service hereinafter mentioned, over the age of 18 years

21  and not a party to the above-entitled cause.  My business address is Screen Actors Guild, Inc.,

22  5757 Wilshire Boulevard, Los Angeles, California 90036, and I am employed in Los Angeles

23  County, California.

24          I served the **Statement of Claim and Demand for Arbitration** on **August 13, 2009** by

25  placing for collection and deposit in the United States mail at Screen Actors Guild, Inc., 5757

26  Wilshire Boulevard, in Los Angeles, Los Angeles County, California, one copy to be sent by

27  first class mail, as well as one copy to be sent via certified mail, return receipt requested, in a

28  ///

                                    - 1 -

1  sealed envelope to the following addressee(s):

2  Agent for Service of Process            Mr. Ed Renouard
   Ed Renouard Productions                 Ed Renouard Productions
3  702 E. Mission Ave.                     702 E. Mission Ave.
   Spokane, WA 99202                       Spokane, WA 99202
4

5          I am familiar with the practice of Screen Actors Guild, Inc. for the collection and the

6  processing of correspondence for mailing with the United States Postal Service.  In accordance

7  with the ordinary course of business, the above-mentioned document would have been deposited

8  with the United States Postal Service with postage fully pre-paid on the same day on which I

9  placed such document at Screen Actors Guild, Inc., 5757 Wilshire Boulevard, in Los Angeles,

10 Los Angeles County, California for deposit.

11         I declare under penalty of perjury under the laws of the State of California that the

12 foregoing is true and correct.

13         Executed this 13th day of August, 2009 at Los Angeles, California.

14

15                                         Marcy Reed

16

17

18

19

20

21

22

23

24

25

26

27

28

- 2 -

Proof of Service

"EXHIBIT E"

LEGAL DEPARTMENT

WRITER'S DIRECT DIAL:

(323) 549-6623

WRITER'S E-MAIL:

bchavez@sag.org

## VIA U.S. AND CERTIFIED MAIL

December 23, 2009

Agent for Service of Process
Ed Renouard Productions
702 E. Mission Ave.
Spokane, WA 99202

Mr. Ed Renouard
Ed Renouard Productions
702 E. Mission Ave.
Spokane, WA 99202

Re:     **Tracy Jewelers, "*Lady In Red*"**
        **SAG Case No. TM 4569**

Dear Ed:

I am very sorry that our informal efforts to resolve this claim have not been fruitful.
Since you refuse to pay the amounts that are due, pursuant to the relevant collective
bargaining agreement, you must contact me within 15 days to select an arbitrator so that
we may proceed to schedule an arbitration hearing.

If I have not heard from you by January 7, 2010, I will unilaterally select an arbitrator.

Regards,

Bonnie Chávez
Counsel

**SCREEN ACTORS GUILD**

5757 WILSHIRE BOULEVARD, 7TH FL ★ LOS ANGELES, CALIFORNIA 90036-3600 ★ Tel. 323.954.1600 ★ Fax 323.549.6624

www.sag.org

Branch of Associated Actors and Artistes of America / AFL-CIO ·····►◄····· Affiliate of International Federation of Actors

"EXHIBIT F"

**LEGAL DEPARTMENT**



WRITER'S DIRECT DIAL:

(323) 549-6623

WRITER'S E-MAIL:

bchavez@sag.org

<u>VIA U.S. AND ELECTRONIC MAIL</u>

February 8, 2010

Sara Adler, Esq.
Arbitrator
1034 Selby Avenue
Los Angeles, CA 90024

Re:    **Tracy Jewelers, "*Lady in Red*"**
       **TM 4569**

Dear Arbitrator Adler:

I have unilaterally selected you as the arbitrator for the above referenced matter. Despite advising Mr. Renouard that I intended to set this matter for hearing and requesting that he engage in arbitrator selection on or by January 7, 2010, he has not contacted me to engage in the striking process. The address for respondent is as follows:

Mr. Ed Renouard
Ed Renouard Productions
702 E. Mission Ave.
Spokane, WA 99202

This letter will confirm that this matter is set for hearing at 10:00 a.m. on March 15, 2010 at our offices.

Feel free to contact me if you require any additional information.

Very truly yours,

BONNIE CHAVEZ
Counsel

cc:    Ed Renouard Productions
       Ed Renouard, ed@ed-renouard.com

**"EXHIBIT G"**

ARBITRATION PROCEEDING

In the Matter of Arbitration    )

        between    )

SCREEN ACTORS GUILD, INC., et al.    )

        and    )

ED RENOUARD PRODUCTIONS    )

Re: "Lady in Red"; Tracy Jewellers  )

AWARD

Case # TM 4569

1. Pursuant to notice, this matter came to hearing before the Undersigned on March 15, 2010. Bonnie Chavez, Esq. represented Screen Actors Guild, Inc. (SAG). Ed Renouard Productions (Producer) neither appeared nor sought a continuance. The matter was considered fully submitted at the close of the hearing.

2. Producer is a signatory to the 2003 & 2006 Basic Commercial Agreements and the AFTRA/SAG Adherence Letter (collectively Basic Agreement).

3. Producer produced "Lady in Red" (Commercial) that ran in 2008 as well 2007 resulting in additional fees becoming due as well as one showing in Spokane for which an additional fee is due. Producer is also liable for the associated Pension & Health contributions.

4. These sums have been demanded and not paid.

5. Pursuant to the Basic Agreement, this failure to pay results in Late Payment Liquidated Damages (LPLD) becoming due as well.

6. The parties are to split the $800 fee of the Arbitrator.

AWARD

It is the Award of the Arbitrator that:

1. Producer is ordered to pay to SAG on

    behalf of performers in the Picture:

    Damages for failure to pay holding and

    use fees & P & H contributions as well

    as LPLD as follows:

    | | |
    |---|---|
    | Holding fees | $1,184.40 |
    | Use fee | $   592.20 |
    | P & H | as calculated by SAG |
    | LPLD | $5,440.00 |

    And all costs of collecting and distributing these

    required payments.

2. The parties are to split the $800 fee of the

    Arbitrator.

DATED: June 25, 2010                    Respectfully submitted,

                                        Sara Adler

                                        Sara Adler, Arbitrator

**"EXHIBIT H"**



**SAG·AFTRA.**

May 12, 2014

Ed Renouard
Ed Renouard Productions
702 E. Mission Ave.
Spokane, WA 99202

**Re:    Meet and Confer re: Confirmation Motion**
**"Lady In Red" - Case No. TM 4569**

Dear Respondent:

In connection with the commercial, "Lady In Red", Screen Actors Guild - American Federation
of Television and Radio Artists ("Union"), as successor-in-interest to Screen Actors Guild, Inc.,
intends to file a motion against Ed Renouard dba Ed Renouard Productions for an order
confirming an arbitration award and for entry of judgment in conformity therewith. The motion
will be filed in the United States District Court, Central District of California, and we will
provide you with notice of the motion.

Pursuant to Local Rule 7-3, I wish to arrange a conference to discuss the motion as well as
potential resolution of this matter. On May 8, 2014, I attempted to contact you via telephone at
(509) 994-4427. No one answered so I left a voice message requesting a call back. Also on May
8, 2014, I attempted to contact you at (509) 668-2200 however I was told by the receptionist that
you no longer work in that office. On May 9, 2014, I attempted to contact you again via
telephone at (509) 994-4427. The call was unanswered so I left another voice message with my
phone number and requested a call back.

Monies are still outstanding in connection with the above commercial. If the Union does not
receive full and prompt payment, we will be forced to confirm the arbitration award as a
judgment. Please contact me as soon as possible to discuss resolution of this matter.

Very truly yours,

Emily Thenard

Emily Fung Thenard
Counsel

Emily Fung Thenard, Counsel
emily.thenard@sagaftra.org  • SAGAFTRA.org • Tel: 323.549.6628/ Fax: 323.549.6624
SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS
5757 Wilshire Blvd., 7th Floor, Los Angeles, CA 90036-3600
Associated Actors & Artistes of America / AFL-CIO

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

| I. (a) PLAINTIFFS ( Check box if you are representing yourself ☐ ) | DEFENDANTS ( Check box if you are representing yourself ☐ ) |
|---|---|
| Screen Actors Guild - American Federation of Television and Radio Artists, as successor-in-interest to Screen Actors Guild, Inc. | Ed Renoaurd dba Ed Renouard Productions |

| (b) County of Residence of First Listed Plaintiff | County of Residence of First Listed Defendant |
|---|---|
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY) |

| (c) Attorneys (Firm Name, Address and Telephone Number) If you are representing yourself, provide the same information. | Attorneys (Firm Name, Address and Telephone Number) If you are representing yourself, provide the same information. |
|---|---|
| Emily Thenard<br>SAG-AFTRA, 5757 Wilshire Blvd., 7th Floor<br>Los Angeles, CA 90036 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

- ☐ 1. U.S. Government Plaintiff
- ☒ 3. Federal Question (U.S. Government Not a Party)
- ☐ 2. U.S. Government Defendant
- ☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

- ☒ 1. Original Proceeding
- ☐ 2. Removed from State Court
- ☐ 3. Remanded from Appellate Court
- ☐ 4. Reinstated or Reopened
- ☐ 5. Transferred from Another District (Specify)
- ☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No    (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No        ☐ **MONEY DEMANDED IN COMPLAINT:** $

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

29 U.S.C. 185 (a)

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | **TORTS** | ☐ 530 General | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | ☐ 370 Other Fraud | **Other:** | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | | ☐ 350 Motor Vehicle | **CIVIL RIGHTS** | ☐ 690 Other | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 895 Freedom of Info. Act | ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 896 Arbitration | ☐ 196 Franchise | ☐ 362 Personal Injury-Med Malpratice | ☐ 442 Employment | ☒ 720 Labor/Mgmt. Relations | |
| | **REAL PROPERTY** | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/ Accommodations | ☐ 740 Railway Labor Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | ☐ 220 Foreclosure | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

| FOR OFFICE USE ONLY: | Case Number: | |
|---|---|---|
| CV-71 (11/13) | CIVIL COVER SHEET | **CV14-4400** |

Page 1 of 3

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A: Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes ☒ No | ☐ Los Angeles | Western |
| If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| Question B: Is the United States, or one of its agencies or employees, a party to this action? | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| ☐ Yes ☒ No | A PLAINTIFF? Then check the box below for the county in which the majority of DEFENDANTS reside. | A DEFENDANT? Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Los Angeles | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | ☐ Riverside or San Bernardino | Eastern |
| | ☐ Other | ☐ Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? (Make only one selection per row) | A. Los Angeles County | B. Ventura, Santa Barbara, or San Luis Obispo Counties | C. Orange County | D. Riverside or San Bernardino Counties | E. Outside the Central District of California | F. Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of defendants reside: | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |
| Indicate the location in which a majority of claims arose: | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |

**C.1. Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column C

☐ only 1 answer in Column C and no answers in Column D

Your case will initially be assigned to the
SOUTHERN DIVISION.
Enter "Southern" in response to Question D, below.

If none applies, answer question C2 to the right. ➡

**C.2. Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column D

☐ only 1 answer in Column D and no answers in Column C

Your case will initially be assigned to the
EASTERN DIVISION.
Enter "Eastern" in response to Question D, below.

If none applies, go to the box below. ⬇

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | Western Division. |

CIVIL COVER SHEET

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**IX(a). IDENTICAL CASES:** Has this action been previously filed in this court?          ☒ NO     ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:** Is this case related (as defined below) to any cases previously filed in this court?     ☒ NO     ☐ YES

If yes, list case number(s): _____

**Civil cases are related when they:** (1) arise from the same or a closely related transaction, happening, or event; (2) call for determination of the same or substantially related or similar questions of law and fact; or (3) for other reasons would entail substantial duplication of labor if heard by different judges. That cases may involve the same patent, trademark, or copyright is not, in itself, sufficient to deem cases related.

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):** _____     DATE: 6/5/14

**Notice to Counsel/Parties:** The submission of this Civil Cover Sheet is required by Local Rule 3-1. This Form CV-71 and the information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. For more detailed instructions, see separate instruction sheet (CV-071A).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |